JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Rocket Exteriors LLC and Jesse Carpenter

**DEFENDANTS**
Michael D. Butcher, Asgard Roofing LLC d/b/a Asgard Investments, Consulting and Management, LLC, Modoc Mechanical LLC d/b/a Rocket Service Pros, et al.

**(b)** County of Residence of First Listed Plaintiff    Wayne County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Wayne County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
R.J. Cronkhite (P78374)
Cronkhite Counsel PLLC, 36800 Woodward Ave., Ste. 310, Bloomfield Hills, MI 48304
(248) 309-8602   rj@cronkhitelaw.com

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability   ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander   Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability   Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine   ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle   **PERSONAL PROPERTY** | **LABOR** | ☒ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability   ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury   ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice   ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise |   ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations   ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment   ☐ 535 Death Penalty | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other   **Other:** | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education   ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 1125(a), 15 U.S.C. § 1117(a), MCL 600.2919a(1)
Brief description of cause:
Violation of Lanham Act, including infringement, unfair competition, and false designation of origin, as well as related tort claims.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ >$75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
January 7, 2026

SIGNATURE OF ATTORNEY OF RECORD
/s/ R.J. Cronkhite (P78374)

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

PURSUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?                    ☐ Yes
                                                                                  ■ No

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____


2.          Other than stated above, are there any pending or previously
            discontinued or dismissed companion cases in this or any other        ☐ Yes
            court, including state court? (Companion cases are matters in which    ■ No
            it appears substantially similar evidence will be offered or the same
            or related parties are present and the cases arise out of the same
            transaction or occurrence.)

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____


   Notes : _____

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**ROCKET EXTERIORS LLC**, and
**JESSE CARPENTER**,

       *Plaintiffs*,

Case No.
Hon.

v.

**MICHAEL D. BUTCHER**, **ASGARD**
**ROOFING LLC** d/b/a **ASGARD**
**INVESTMENTS, CONSULTING AND**
**MANAGEMENT, LLC**, **MODOC**
**MECHANICAL LLC** d/b/a **ROCKET**
**SERVICE PROS**, **STARK ENTERPRISES**
**LLC**, **CROSS CONSTRUCTION GROUP,**
**INC., BEAST CRAFTSMEN, LLC**, **BLAZE**
**HOLDCO LLC**, and **BUTCHER AND**
**BUTCHER LLC**,

       *Defendants.*

<u>**JURY DEMANDED**</u>

---

R.J. Cronkhite (P78374)
Christopher A. Chesney (P80969)
Cronkhite Counsel PLLC
36800 Woodward Ave., Ste. 310
Bloomfield Hills, MI 48304
T: (248) 309-8602
F: (248) 256-2555
rj@cronkhitelaw.com
chris@cronkhitelaw.com
*Attorneys for Plaintiffs*

---

<u>**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**</u>

Plaintiffs Rocket Exteriors LLC and Jesse Carpenter, through their attorneys Cronkhite

Counsel PLLC, file their Complaint for Injunctive Relief and Damages against Defendants

Michael D. Butcher, Asgard Roofing LLC d/b/a Asgard Investments, Consulting and Management, LLC ("**Asgard**"), Modoc Mechanical LLC d/b/a Rocket Service Pros, Stark Enterprises LLC, Cross Construction Group, Inc., Beast Craftsmen, LLC, Blaze HoldCo LLC, and Butcher and Butcher LLC, for the below reasons:

## NATURE AND BACKGROUND OF THE DISPUTE

1.      In 2020, Defendant Michael D. Butcher ("**Butcher**") and Plaintiff Jesse Carpenter ("**Carpenter**") formed Plaintiff Rocket Exteriors LLC ("**Rocket Exteriors**") as 50/50 owners.

2.      Rocket Exteriors is a construction company that provides a wide range of construction-related services throughout Michigan, including exterior improvements (such as facades, siding, roofing, gutters, doors, and windows) and interior improvements (such as doors, drywalling, carpentry, painting, HVAC, electrical, and plumbing services)

3.      Rocket Exteriors provides its above services to both commercial and residential projects.

4.      On April 2, 2025, Carpenter bought out Butcher's entire interest in Rocket Exteriors (which had been owned through Butcher's affiliate company, Asgard) pursuant to a written purchase agreement. **Exhibit 1**, *Purchase Agreement*.

5.      From Rocket Exteriors' inception, up until Butcher sold his interest in Rocket Exteriors on April 2, 2025, Butcher managed Rocket Exteriors.

6.     Upon Carpenter's purchase of Rocket Exteriors, Carpenter received—for the first time—access to Rocket Exteriors' Chase bank account and related bank statements.

7.     Carpenter was dismayed to discover that Butcher, while purportedly managing Rocket Exteriors, had engaged in systemic conversion, fraud, and embezzlement—resulting in the diversion of millions of dollars of Rocket Exteriors' money to Butcher and his affiliate companies, who are named as co-defendants in this case.

8.     On top of this misconduct, following Butcher's sale of Asgard's interest in Rocket Exteriors, Butcher embarked on a concerted, calculated campaign to unfairly compete with Plaintiffs.

9.     Butcher's unfair competition includes misappropriating Rocket Exteriors' name and logo, as well as Rocket Exteriors' trade secrets.

10.     In October of 2025, Butcher renamed one of his companies, Modoc Mechanical LLC, as "Rocket Service Pros" ("**Rocket Service**").

11.     On top of Butcher's and Rocket Service's misappropriation of Rocket Exteriors' name, in October of 2025, Butcher and Rocket Service also misappropriated Rocket Exteriors' logo, which, like its name, Rocket Exteriors has been using since 2020:

| Rocket Exteriors' Use of its Marks: | Rocket Service's Infringing Marks: |
|---|---|
|  | |
| *Figure 1* | *Figure 2* |

12.    Butcher then commenced providing HVAC, plumbing, and electrical construction services using the name "Rocket Service Pros," and the logo depicted above in Figure 2 (collectively, the "**Infringing Marks**"), including as shown below in Figure 3:



*Figure 3*

13.    Butcher and Rocket Service are also prominently using the Infringing Marks online, including on Rocket Service's website located at www.rocketservicepros.com.[1]

14.    Butcher and Rocker Service infringed on Rocket Exteriors' logo, and renamed Modoc to "Rocket Service Pros," in order to confuse and deceive the public as to the nature and source of Rocket Service's goods and services and, ultimately, to ensure the success of Butcher's plan to unfairly compete against Plaintiffs.

15.    Butcher also misappropriated and used Rocker Exteriors' trade secrets, namely its customer and prospect lists, in order to solicit customers through Rocket Service.

---

[1] **https://perma.cc/45JR-4X3C** [captured January 2, 2026].

16.     Butcher's and Rocket Service's actions violate not only federal and Michigan law but also Butcher's non-competition, non-solicitation, non-disclosure, and non-use covenants set forth in Rocket Exteriors' Partner Agreement. **Ex. 2**, §§ 11.2.2–11.2.4; § 11.3.

17.     In this context, following Butcher's April 2, 2025 execution of the Purchase Agreement, Butcher now refuses to acknowledge that Asgard sold its interest in Rocket Exteriors pursuant to the above Purchase Agreement.

18.     Instead, Butcher has recently demanded that Carpenter pay money above and beyond the Purchase Agreement before Butcher will acknowledge that Asgard is no longer an owner of Rocket Exteriors.

19.     Butcher's position puts him in a remarkable predicament: Butcher is openly and unfairly competing against Rocket Exteriors—using Rocket Exteriors' intellectual property and trade secrets—while simultaneously claiming he owns Rocket Exteriors.

20.     Plaintiffs now seek preliminary and injunctive relief, and a temporary restraining order, because Defendants' actions threaten imminent, irreparable harm to Plaintiffs in the form of loss of customer goodwill and damage to Rocket Exteriors' brand and image.

21.     Plaintiffs also seek a declaratory judgment declaring that Butcher and Asgard are no longer owners of Rocket Exteriors following execution of the Purchase Agreement.

22.     Plaintiffs also seek compensatory damages, treble damages pursuant to Michigan's Civil Conversion statue, MCL 600.2919a(1), disgorgement of Defendants' ill-

gotten profits, and attorney's fees based on Defendants' trademark infringement, violations of the Partner Agreement, and other misconduct detailed in this Complaint.

## PARTIES

23.     Plaintiff Rocket Exteriors LLC is a Michigan limited liability company headquartered and doing business in Michigan, including Wayne County, Michigan.

24.     Plaintiff Jesse Carpenter is an individual who resides in Livingston County, Michigan, and is a citizen of Michigan.

25.     Defendant Michael D. Butcher is an individual who resides in Wayne County, Michigan, and is a citizen of Michigan.

26.     Defendant Asgard Roofing LLC d/b/a Asgard Investments, Consulting and Management, LLC is a Michigan limited liability company headquartered and doing business in Michigan, including Wayne County, Michigan.

27.     Butcher is an owner of Asgard.

28.     Butcher controls Asgard.

29.     Defendant Modoc Mechanical LLC d/b/a Rocket Service Pros is a Michigan limited liability company headquartered and doing business in Michigan, including Wayne County, Michigan.

30.     Butcher is an owner of Rocket Service Pros.

31.     Butcher controls Rocket Service Pros.

6

32.     Defendant Stark Enterprises LLC ("**Stark Enterprises**") is a Michigan limited liability company headquartered and doing business in Michigan, including Wayne County, Michigan.

33.     Butcher is an owner of Stark Enterprises.

34.     Butcher controls Stark Enterprises.

35.     Defendant Cross Construction Group, Inc. ("**Cross Construction**") is a Michigan corporation headquartered and doing business in Michigan, including Wayne County, Michigan.

36.     Butcher, along with Butcher's father, Roger Butcher, owns Cross Construction.

37.     Butcher controls Cross Construction.

38.     Defendant Beast Craftsmen, LLC ("**Beast Craftsmen**") is a Michigan limited liability company headquartered and doing business in Michigan, including Wayne County, Michigan.

39.     Butcher is an owner of Beast Craftsmen.

40.     Butcher controls Beast Craftsmen.

41.     Defendant Blaze HoldCo LLC ("**Blaze HoldCo**") is a Michigan limited liability company headquartered and doing business in Michigan, including Wayne County, Michigan.

42.     Butcher is an owner of Blaze HoldCo.

43.     Butcher controls Blaze HoldCo.

44.     Defendant Butcher and Butcher LLC ("**Butcher & Butcher**") is a Michigan limited liability company headquartered and doing business in Michigan, including Wayne County, Michigan.

45.     Butcher is an owner of Butcher & Butcher.

46.     Butcher controls Butcher & Butcher.

## JURISDICTION AND VENUE

47.     The Court has federal question subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.

48.     This Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §§ 1338 and 1367 because those claims are so closely related to the federal claims within the Court's original jurisdiction that such state law claims form part of the same case or controversy.

49.     This Court has general and specific personal jurisdiction over Defendants for at least the reason that all of them are either individuals, or Michigan limited liability companies, or Michigan corporations doing business in Wayne County, Michigan, which is within this judicial district.

50.     This Court has general and specific personal jurisdiction over Butcher pursuant to MCL 600.701 and MCL 600.705 because Butcher is domiciled in, employed in, and regularly transacts business within Michigan, including Wayne County, Michigan, which is within this judicial district.

51.     Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants maintain a place of business within this judicial district, all Defendants engage in business activity within this judicial district, Butcher resides in this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

## GENERAL ALLEGATIONS

**I.     Butcher and Carpenter form Rocket Exteriors as equal owners and managers**.

52.     Carpenter has been in the construction industry since 2018.

53.     Carpenter specializes not only in general construction knowledge but also customer relationships and the sale of construction services.

54.     In August of 2020, Butcher approached Carpenter and proposed that Carpenter and Butcher form a new company—as equal owners—to provide construction services.

55.     Butcher proposed teaming up with Carpenter in August of 2020 because Butcher wished to leverage, and benefit from, Carpenter's significant skillset in construction generally and sales specifically.

56.     At the above August 2020 meeting, Carpenter and Butcher agreed to launch a new construction business that they would jointly own and manage.

57.     The next day, on August 12, 2020, Butcher incorporated Rocket Exteriors in the State of Michigan.

58.     Butcher and Carpenter also signed a Partner Agreement naming Butcher and Carpenter as equal owners and co-managers of Rocket Exteriors.

**II.     Rocket Exteriors' management.**

59.     Starting with Rocket Exteriors' original 2020 Partner Agreement, and continuing through the present date, Carpenter has been a named Manager of Rocket Exteriors.

60.     Starting with Rocket Exteriors' original 2020 Partner Agreement, and continuing until April 2, 2025, Butcher had also been a named Manager of Rocket Exteriors.

61.     While both Butcher and Carpenter were named as Managers for most of Rocket Exteriors' existence, in reality, Butcher managed Rocket Exteriors and made all financial and management decisions for Rocket Exteriors, from its inception until Butcher's exit.

62.     As such, Butcher mandated that Carpenter seek and obtain Butcher's approval before Carpenter could take any action at Rocket Exteriors.

63.     By way of example, from the date of Rocket Exteriors' incorporation, until April 2, 2025, Butcher:

        a.     exclusively controlled Rocket Exteriors' books and records;

        b.     exclusively controlled Rocket Exteriors' accounting system;

        c.     exclusively controlled Rocket Exteriors' Chase bank account;

        d.     exclusively controlled the ability to write checks on behalf of Rocket Exteriors;

e.   exclusively controlled Rocket Exteriors' marketing; and

f.   exclusively controlled Rocket Exteriors' member distributions to Carpenter and Butcher.

64.   In contrast, during the 4.5-year period that Butcher managed Rocket Exteriors, Carpenter did not have direct access to Rocket Exteriors' books and records (such as its general ledger, profit & loss statements, and balance sheets) and also could not access or view Rocket Exteriors' Chase bank account, which prevented Carpenter from accurately reviewing, understanding, or corroborating what Butcher was doing with Rocket Exteriors' assets and money.

65.   Butcher also failed to make Carpenter an authorized signatory on Rocket Exteriors' Chase bank account despite Carpenter's multiple requests.

**III.   Carpenter generates millions in revenue for Rocket Exteriors.**

66.   Shortly after Rocket Exteriors' incorporation, Carpenter began providing significant and valuable services to Rocket Exteriors.

67.   For example, in March of 2021, Carpenter procured a construction contract on behalf of Rocket Exteriors that ultimately generated approximately $6,000,000.00 in revenue for Rocket Exteriors.

68.   Over the course of five years, Carpenter generated over $13,000,000.00 in revenue for Rocket Exteriors based on his sales alone.

**IV.**     **The operative 2023 Partner Agreement and its pertinent provisions.**

69.     In January of 2023, Butcher, Asgard, and Carpenter signed the Partner Agreement of Rocket Exteriors LLC, a copy of which is attached hereto as **Exhibit 2** (the "**2023 Partner Agreement**").

70.     The Partner Agreement replaced and superseded Rocket Exterior's original 2020 Partner Agreement.

71.     The 2023 Partner Agreement identifies Carpenter and Asgard as equal 50/50 members and owners of Rocket Exteriors. **Ex. 2**, *Exhibit A*.

72.     At all relevant times, Butcher has owned and controlled Asgard.

73.     The 2023 Partner Agreement specifies that Rocket Exteriors "shall be managed by one or more Managers, and not the Members. . ." **Ex. 2**, § 4.1

74.     The 2023 Partner Agreement identifies Butcher as a Manager of Rocket Exteriors. **Ex. 2**, § 4.1.1.

75.     The 2023 Partner Agreement also identifies Carpenter as a Manager of Rocket Exteriors. *Id.*

76.     The 2023 Partner Agreement prohibits Managers from entering into any "transaction involving an actual or potential conflict of interest between a Manager or Member and" Rocket Exteriors. **Ex. 2**, § 4.3.5.

77.     The 2023 Partner Agreement contains a one-year covenant that prohibits Butcher and Asgard from, "directly or indirectly," competing with Rocket Exteriors within a

sixty (60) mile radius of Rocket Exteriors "with respect to any of the business activities conducted or engaged in by" Rocket Exteriors. **Ex. 2**, § 11.2.4.

78.    The 2023 Partner Agreement contains a one-year covenant that prohibits Butcher and Asgard from, "directly or indirectly," soliciting, providing services to, or selling products to any Rocket Exteriors' customer. **Ex. 2**, §§ 11.2.2 and 11.2.3.

79.    The 2023 Partner Agreement contains confidentiality, non-disclosure, and non-use covenants that prohibit Butcher and Asgard from, "directly or indirectly," disclosing or using any of Rocket Exteriors' confidential information. **Ex. 2**, § 11.3.

### V.    Butcher's control over Rocket Exteriors.

80.    Despite Carpenter generating millions of dollars in revenue for Rocket Exteriors, Butcher would regularly report to Carpenter that Rocket Exteriors was not performing well financially, did not have sufficient funds to make member distributions, and could not afford to make regular distributions to Carpenter.

81.    Butcher would communicate Rocket Exteriors' alleged financial performance during monthly meetings at which Butcher would provide Carpenter monthly "financial reports" purporting to accurately identify Rocket Exteriors' financial performance, including revenues and expenses that Rocket Exteriors was allegedly incurring.

82.    Indeed, during Butcher's 4.5-year tenure as Manager, Rocket Exteriors distributed less than $290,000.00 to Carpenter in membership distributions.

83.     Beginning in 2023 and continuing into 2024, Carpenter raised concerns with Butcher regarding Rocket Exteriors' alleged poor financial performance and failure to make adequate distributions.

84.     Carpenter repeatedly asked Butcher to explain how it was that Rocket Exteriors was not performing well financially despite Rocket Exteriors generating approximately $4 million in annual revenue—revenue largely due to Carpenters' sales activities and other contributions.

85.     Butcher retaliated against Carpenter by prohibiting Carpenter from participating in, or knowing about, multiple aspects of Rocket Exteriors' operations.

86.     For instance, Butcher removed Carpenter from all Rocket Exteriors' marketing activities, including participating in meetings, being updated on marketing activities and progress, and the like.

87.     Butcher also removed Carpenter's access to Rocket Exteriors' accounting software.

88.     Further, and as set forth above, Carpenter at this time did not have access to Rocket Exteriors' Chase bank account, or to Rocket Exteriors' books and records.

89.     As such, Carpenter was totally reliant on Butcher's above-referenced monthly "financial reports" by which Butcher reported Rocket Exteriors' alleged financial performance.

90.     As Carpenter continued to inquire with Butcher regarding Rocket Exteriors' inexplicable financial performance, Butcher told Carpenter that Butcher was not earning

enough money to maintain Butcher's "lifestyle" and that Carpenter would need to start paying Butcher more money if Carpenter wanted Butcher to continue to manage Rocket Exteriors.

91. Carpenter refused.

**VI.   Carpenter buys out Asgard and Butcher, reviews Rocket Exteriors' financials and bank statements, and discovers Defendants' embezzlement, malfeasance, and other misconduct.**

92. In the above context, Butcher's continued management of Rocket Exteriors became untenable.

93. In January of 2025, Carpenter approached Butcher to initiate discussions by which Carpenter would purchase the entirety of Asgard's 50% membership interest in Rocket Exteriors such that Carpenter would become the sole and complete owner of Rocket Exteriors.

94. After extended negotiations, Butcher and Carpenter reached terms.

95. Butcher drafted a simplified purchase agreement by which Asgard offered to sell its entire membership interest in Rocket Exteriors to Carpenter in exchange for nearly $300,000.00 worth of consideration (the "**Purchase Agreement**").

96. On April 2, 2025, Butcher texted an unsigned version of the Purchase Agreement to Carpenter.

97. Carpenter made no changes to the Purchase Agreement.

98. Later in the day of April 2, 2025, both Butcher (on behalf of Asgard) and Carpenter signed the Purchase Agreement. A copy of the fully-executed Purchase Agreement is attached as **Exhibit 1**.

99. Pursuant to the Purchase Agreement, Asgard sold its entire interest in Rocket Exteriors to Carpenter. **Ex. 1**, ¶ 1.

100. Pursuant to the Purchase Agreement, Carpenter agreed to pay Asgard a purchase price of $227,000.00 (the "**Purchase Price**"). *Id.*

101. Pursuant to the Purchase Agreement, Carpenter was required to make an initial downpayment of $40,000.00 on April 2, 2025, a second installment payment of $23,000.00 paid by April 16, 2025, with the remaining money paid over sixty (60) months, beginning on January 1, 2026.

102. The Purchase Agreement also required, as additional consideration, that Carpenter cause Rocket Exteriors to transfer its rights in a $29,000.00 account receivable to one of Butcher's companies—Blaze HoldCo.

103. To date, Carpenter has performed all of his obligations due and owing under the Purchase Agreement:

      a. On April 3, 2025, Carpenter paid Asgard the above $40,000.00 downpayment.

      b. On April 14, 2025, Carpenter also paid Asgard the above-referenced second installment payment of $23,000.00.

      c. On January 1, 2026, Carpenter also began making the above-referenced monthly payments toward the remainder of Purchase Price.

d.     Carpenter also caused Rocket Exteriors to transfer the above $29,000.00 account receivable to Blaze HoldCo.

104.   Butcher, either directly or indirectly through Blaze HoldCo or Asgard, accepted receipt of all of the above consideration, including Carpenter's payment to date of over $67,000.00 in money and transfer of the $29,000.00 account receivable.

105.   In the months following Carpenter's purchase of Asgard's interest in Rocket Exteriors, and Carpenter's access to Rocket Exteriors' Chase bank account, bank statements, and accounting software, Carpenter was shocked to discover that Butcher had engaged in fraud, embezzlement, and other malfeasance to the detriment of both Rocket Exteriors and Carpenter, including the conversion embezzlement, fraud, malfeasance, and breaches of duty set forth below.

**A.     Fraudulent Payments to Asgard and Stark Enterprises.**

106.   While Butcher was Manager of Rocket Exteriors, Butcher used two entities—Asgard and Stark Enterprises—to "perform" management services for Rocket Exteriors.

107.   At all relevant times, Butcher owned and controlled both Asgard and Stark Enterprises.

108.   In 2024, Butcher represented to Carpenter that Asgard was charging Rocket Exteriors a total of $120,000.00 per year, or $10,000.00 per month, for its "management" services.

109.   Following Carpenter's purchase of Rocket Exteriors, and as part of Carpenter's review of Rocket Exteriors' bank account and accounting records, Carpenter discovered that

17

Butcher had in fact diverted at least $313,879.84 of Rocket Exteriors' money to Asgard—$193,879.84 more than what Butcher reported to Carpenter.

110.   Butcher routinely and systematically diverted more than $10,000.00 per month from Rocket Exteriors under the pretense of management fees, including, by way of example, the following transactions:

      a.   In September of 2024, Butcher used $26,567.00 of Rocket Exteriors' money to pay for Asgard's alleged management fees.

      b.   In October of 2024, Butcher used $47,134.00 of Rocket Exteriors' money to pay for Asgard's alleged management fees.

      c.   In November of 2024, Butcher used $17,701.49 of Rocket Exteriors' money to pay for Asgard's alleged management fees.

      d.   In December of 2024, Butcher used $31,140.04 of Rocket Exteriors' money to pay for Asgard's alleged management fees.

      e.   In January of 2025, Butcher used $20,494.00 of Rocket Exteriors' money to pay for Asgard's alleged management fees.

      f.   In February of 2025, Butcher used $16,739.00 of Rocket Exteriors' money to pay for Asgard's alleged management fees.

      g.   In March of 2025, Butcher used $13,958.40 of Rocket Exteriors' money to pay for Asgard's alleged management fees.

111.   Butcher also had Stark Enterprises and Asgard charge Rocket Exteriors, and had Rocket Exteriors pay, for Butcher's and family members' personal expenses, including, by way of example, the following transactions:

      a.   Payments for Butcher's RV.

      b.   Payments for Butcher's groceries.

    c.     Payments for Butcher's nanny.

    d.     Payments for Butcher's personal travel.

    e.     Payments for Butcher's personal membership fees.

    f.     Payments for Butcher's parents' personal vehicles.

    g.     Purported "payroll" payments to Butcher's parents.

112.   None of these payments were authorized by Carpenter, nor did Carpenter have any knowledge of them until Butcher sold his interest in Rocket Exteriors and provided Carpenter access to Rocket Exteriors' Chase bank account.

113.   Butcher's above payments of Rocket Exteriors' money to Asgard, and Asgard's acceptance of them, constitute conversion, fraud, embezzlement, breach of fiduciary duties (including conflicts of interest and self-dealing, among others), unjust enrichment, and breach of the 2023 Partner Agreement, among other wrongs.

114.   Butcher's above payments of Rocket Exteriors' money to Stark Enterprises, and Stark Enterprises' acceptance of them, constitute conversion, fraud, embezzlement, breach of fiduciary duties (including conflicts of interest and self-dealing, among others), unjust enrichment, and breach of the 2023 Partner Agreement, among other wrongs.

    **B.**    **Butcher routes Rocket Exteriors' personnel through Butcher's "payroll" companies to embezzle Rocket Exteriors' money.**

115.   During Butcher's management of Rocket Exteriors, Butcher caused Stark Enterprises and Beast Craftsmen to charge Rocket Exteriors', and Rocket Exteriors to pay,

for unidentified "services" allegedly performed by Stark Enterprises and Beast Craftsmen pertaining to labor performed by Rocket Exteriors.

116.    At all relevant times, Butcher owned and controlled Stark Enterprises and Beast Craftsmen.

117.    Butcher's retention of Stark Enterprises and Beast Craftsmen to perform alleged "services" to Rocket Exteriors is a direct conflict of interest, self-dealing, and breach of the 2023 Partner Agreement and Butcher's fiduciary duties.

118.    Further, Butcher did not have either Stark Enterprises or Beast Craftsmen execute any agreements or documents reflecting their services to Rocket Exteriors or the cost of those services.

119.    Further, to the extent that Stark Enterprises and Beast Craftsmen provided services to Rocket Exteriors at all, they charged Rocket Exteriors well in excess of the costs for such services.

120.    On top of this, Stark Enterprises and Beast Craftsmen refused to provide a breakdown of the payroll charges or to otherwise provide clarity on the charges.

121.    Notably, there are no contracts, invoices, or other documentation identifying or corroborating the alleged services that Stark Enterprises and Beast Craftsmen provided to Rocket Exteriors.

122.    Butcher had Stark Enterprises and Beast Craftsmen provide "services" to Rocket Exteriors, and then overcharge for those services, to embezzle money from Plaintiffs and to divert that money from Plaintiffs to Butcher.

123.    On top of this misconduct, during Butcher's management of Rocket Exteriors, Butcher intentionally chose not to hire W-2 employees for Rocket Exteriors.

124.    Instead, Butcher would hire employees through Stark Enterprises or Beast Craftsmen.

125.    Butcher did so despite doing so being in direct conflict of interest with Butcher's duties owed to Rocket Exteriors, as well as self-dealing.

126.    Butcher nonetheless put all of Rocket Exteriors' personnel on Stark Enterprises and Beast Craftsmen's payroll in order both ensure total control over Rocket Exteriors' work force and as a front to charge Rocket Exteriors for non-existent "services" allegedly provided by Stark Enterprises and Beast Craftsmen.

127.    In 2024 alone, Butcher had Rocket Exteriors pay Beast Craftsmen no less than $1,099,673.33 for undocumented "services" with no backup documentation or contracts in place.

128.    Butcher's above payments of Rocket Exteriors' money to Stark Enterprises, and Stark Enterprises' acceptance of them, constitute conversion, fraud, embezzlement, breach of fiduciary duties (including conflicts of interest and self-dealing, among others), unjust enrichment, and breach of the 2023 Partner Agreement, among other wrongs.

129.    Butcher's above payments of Rocket Exteriors' money to Beast Craftsmen, and Beast Craftsmen's acceptance of them, constitute conversion, fraud, embezzlement, breach of fiduciary duties (including conflicts of interest and self-dealing, among others), unjust enrichment, and breach of the 2023 Partner Agreement, among other wrongs.

### C.    The Hazelwood Project and Fraudulent Cross Construction "Loan."

130.    In 2022, Butcher caused on one his companies, Cross Construction, to subcontract with Rocket to perform services for two construction projects located at 646 Hazelwood and 660 Hazelwood, Detroit (collectively, the "**Hazelwood Project**").

131.    The Hazelwood Project had a total contract value of $1,075,988.00.

132.    Cross Construction served as the prime contractor on the Hazelwood Project.

133.    At all relevant times, Butcher was an owner of Cross Construction and controlled Cross Construction.

134.    By having Cross Construction serve as prime contractor, and Rocket Exteriors serve as a subcontractor, Cross Construction, rather than Rocket Exteriors, would receive the customer payments for work performed by Rocket Exteriors on the Hazelwood Project.

135.    As such, Butcher controlled whether Rocket Exteriors—via Cross Construction—would be paid on the Hazelwood Project.

136.    Because Butcher controlled both Cross Construction and Rocket Exteriors at the time, and because Cross Construction served as prime contractor and received payments

directly from the customer, Butcher could illicitly short Rocket Exteriors on payments—and instead retain the payments to Cross Construction—without Carpenter knowing about it.

137.    Rocket Exteriors ultimately performed all of its work on the Hazelwood Project.

138.    The Hazelwood Project customer paid Cross Construction a substantial deposit of approximately one million dollars to Cross Construction on the Hazelwood Project.

139.    On top of the initial deposit, the Hazelwood Project customer also paid Cross Construction additional millions of dollars on the Hazelwood Project.

140.    Based on the Hazelwood Project customers' above payments, Cross Construction had more than enough money to pay Rocket Exteriors' entire contract price of $1,075,988.00 for the Hazelwood Project.

141.    Following Carpenter's purchase of Rocket Exteriors, and as part of Carpenter's review of Rocket Exteriors' bank account and accounting records, Carpenter discovered that only $733,328.44 of the $1,075,988.00 in payments was accounted for—and that Cross Construction never paid the remaining $342,659.56.

142.    Further, Carpenter discovered that Butcher had misrepresented that Cross Construction had paid Rocket Exteriors the remaining $342,659.56 through a number of false accounting software entries and misclassifications, including a fictious transaction involving a "transfer" of Cross Construction's assets and a fictious "loan" to Cross Construction.

143.    There was no "transfer" of Cross Construction assets to Rocket Exteriors, there is no contract or agreement documenting this arrangement, and Carpenter never approved

any such "transfer" of alleged assets in lieu of Cross Construction paying what it owed Rocket Exteriors.

144.    What Butcher appears to have done was effectively deprive Rocket Exteriors of $342,659.56—to Cross Construction's benefit—and give Rocket Exteriors an "IOU."

145.    Because Butcher understood this was fraud, Butcher then doubled down by creating a fraudulent accounting entry calling the IOU a "loan."

146.    But Rocket Exteriors did not issue a "loan" to Cross Construction.

147.    Further, there is no contract, agreement, or promissory note documenting a loan from Rocket Exteriors to Cross Construction, and Carpenter never approved any such "loan."

148.    Indeed, Carpenter never heard of, or approved, any "loan" to Cross Construction or any alleged receipt of Cross Construction assets in exchange for writing off Cross Construction's balance.

149.    Notably, Rocket Exteriors received nothing of value in return for this fictious loan to Cross Construction.

150.    Indeed, to date, Cross Construction has never performed on the "loan" or made a single payment to Rocket Exteriors on the "loan."

151.    Butcher fraudulently fabricated the Cross Construction loan in order to divert at least $342,659.56 in payments from Rocket Exteriors to Butcher and his other companies, including Cross Construction.

152.    Even if the Cross Construction "loan" were somehow legitimate, Butcher engaged in a blatant conflict of interest and self-dealing—in violation of the 2023 Partner Agreement and in breach of his fiduciary duties—to make the "loan."

153.    To date, the $342,659.56 owed by Cross Construction remains unpaid and unaccounted for.

154.    To date, Cross Construction received the benefit of $342,659.56 in services from Rocket Exteriors without paying for those services.

155.    Butcher's above actions in connection with Cross Construction, as well as Cross Construction's retention of benefits from Rocket Exteriors, constitute fraud, embezzlement, breach of fiduciary duties (including conflicts of interest and self-dealing, among others), unjust enrichment, and breach of the 2023 Partner Agreement, among other wrongs.

### D.    Butcher's fraudulent payments to Blaze HoldCo.

156.    After Carpenter approached Butcher to purchase Asgard's interest in Rocket Exteriors, Butcher—who was still managing, and in control of, Rocket Exteriors—began making unauthorized, fraudulent payments from Rocket Exteriors' Chase bank account to Blaze HoldCo.

157.    For example, Butcher caused Rocket Exteriors to pay Blaze HoldCo the following amounts:

a.    In January of 2025, Rocket Exteriors paid Blaze HoldCo $3,074.80.

b.     In February of 2025, Rocket Exteriors paid Blaze HoldCo $3,080.00.

c.     In March of 2025, Rocket Exteriors paid Blaze HoldCo $2,112.00.

d.     In April of 2025, Rocket Exteriors paid Blaze HoldCo $2,200.00.

158.   At all relevant times, Butcher owned and controlled Blaze HoldCo.

159.   Butcher's payments to Blaze HoldCo, even if for legitimate services or goods provided to Rocket Exteriors, would constitute a direct conflict of interest, self-dealing, and breach of the 2023 Partner Agreement and Butcher's fiduciary duties.

160.   But Blaze HoldCo did not in fact provide any services or goods to Rocket Exteriors, including to justify Rocket Exteriors' above payments to Blaze HoldCo.

161.   Indeed, there are no contracts, invoices, or other documentation identifying or corroborating Blaze HoldCo's provision of services or goods to Rocket Exteriors.

162.   Rather, Butcher's payments of Rocket Exteriors' money to Blaze HoldCo were yet another way for Butcher to embezzle money from Plaintiffs and divert that money to Butcher.

163.   Butcher's above payments of Rocket Exteriors' money to Blaze HoldCo, and Blaze HoldCo's acceptance of them, constitute conversion, fraud, embezzlement, breach of fiduciary duties, unjust enrichment, and breach of the 2023 Partner Agreement, among other wrongs.

### E. Butcher's fraudulent real estate transactions regarding the Livonia Building, the Plymouth Building, and "rent" payments to Butcher & Butcher.

164.   In approximately August of 2023, Butcher used Rocket Exteriors' money to finance part of the purchase of commercial real estate, replete with a commercial building, located at 32553 Schoolcraft Road, Livonia, Michigan 48154 (the "**Livonia Building**").

165.   Upon the purchase of the Livonia Building, Rocket Exteriors relocated its headquarters to the Livonia Building.

166.   However, instead of putting the Livonia Building in the name of Rocket Exteriors, Butcher had Rocket Exteriors' titled to Butcher & Butcher.

167.   Nor is there any legal documentation documenting that Rocket Exteriors owns the Livonia Building or any portion thereof.

168.   At all relevant times, Butcher was an owner of, and controlled, Butcher & Butcher.

169.   Shortly after the purchase of the Livonia Building, Butcher caused Butcher & Butcher to sell the Livonia Building to an unknown third party for an unknown sum.

170.   Following the sale of the Livonia Building, Rocket Exteriors continued to maintain its headquarters at, and operate out of, the Livonia Building.

171.   To date, Rocket Exteriors and Carpenter have received no benefits for financing Butcher & Butcher's purchase of the Livonia Building.

172.    Upon information and belief, Butcher transacted the purchase and sale of the Livonia Building such that Butcher & Butcher would serve as manager and landlord of the Livonia Building.

173.    Indeed, instead of Rocket Exteriors being an owner of the Livonia Building, Rocket Exteriors was instead a "tenant"—despite Rocket Exteriors financing a portion of the Livonia Building's purchase price.

174.    As such, following Rocket Exteriors financing the purchase of the Livonia Building, Butcher also had Rocket Exteriors pay Butcher & Butcher monthly "rent" for use of a portion of the Livonia Building.

175.    Carpenter never authorized Rocket Exteriors to enter into any lease for the Livonia Building, nor did Butcher propose or provide any written lease to Carpenter regarding the Livonia Building.

176.    Plaintiffs requested that Butcher provide a written lease between Rocket Exteriors and any party for use of the Livonia Building; Butcher failed to provide any such lease despite the request.

177.    Upon information and belief, no written lease exists between Rocket Exteriors and any party for use of the Livonia Building.

178.    Meanwhile, Butcher had his other entities and affiliate companies use the Livonia Building at reduced or no cost.

179.    Butcher & Butcher also rents out, and receives rent from, other third parties.

180.    Rocket Exteriors received no benefit or financial gain from Butcher & Butcher's receipt of rent from third parties.

181.    Upon Carpenter's purchase of Asgard's interest in Rocket Exteriors, Carpenter was able to review Rocket Exteriors' Chase bank statements.

182.    In reviewing the Chase bank statements, Carpenter identified multiple discrepancies in Rocket Exteriors' alleged "rent" payments to Butcher & Butcher.

183.    Indeed, Rocket Exteriors' monthly rent payments to Butcher & Butcher were not for fixed amounts but rather appeared to be ad hoc payments of varying amounts.

184.    For instance, in 2024, Rocket Exteriors' paid Butcher & Butcher differing monthly amounts each month, allegedly as "rent."

185.    In 2025, Rocket Exteriors continued to pay Butcher & Butcher differing monthly amounts each month as alleged rent, including as follows:

> a.    In January 2025, Rocket Exteriors paid Butcher & Butcher $3,546.00 in alleged rent.
>
> b.    In February of 2025, Rocket Exteriors paid Butcher & Butcher $12,352.00 in alleged rent.
>
> c.    In March of 2025, Rocket Exteriors paid Butcher & Butcher $4,349.00 in alleged rent.
>
> d.    In April of 2025, Rocket Exteriors paid Butcher & Butcher $3,500.00 in alleged rent.

186.    In approximately July of 2024, Butcher also used $200,000.00 of Rocket Exteriors' money to partially finance the purchase of commercial real estate, replete with a

commercial building, located at 8070 N. Territorial Road, Plymouth, Michigan 48170 (the "**Plymouth Building**").

187.    Instead of putting the Plymouth Building in the name of Rocket Exteriors, Butcher had the Plymouth Building titled to Butcher & Butcher.

188.    Nor is there any legal documentation documenting that Rocket Exteriors owns the Plymouth Building or any portion thereof.

189.    To date, Rocket Exteriors and Carpenter have received no benefits for financing Butcher & Butcher's purchase of the Plymouth Building.

190.    Instead, Butcher and his affiliate companies, including Butcher & Butcher, directly benefited from Rocket Exteriors' money to purchase the Plymouth Property, to Rocket Exteriors' financial detriment.

191.    Butcher's above actions in connection with the Livonia Building, the Plymouth Building, and alleged "rent" payments to Butcher & Butcher, and Butcher & Butcher's acceptance of those rent payments, constitute conversion, fraud, embezzlement, breach of fiduciary duties (including conflicts of interest and self-dealing, among others), unjust enrichment, and breach of the 2023 Partner Agreement, among other wrongs.

**VII.    Following the sale, Carpenter addresses Butcher's misconduct and requests information.**

192.    Carpenter, through counsel, notified Butcher and Asgard regarding their above fraudulent activities, embezzlement, and malfeasance.

193.   In support, Carpenter provided information from Rocket Exteriors' accounting software.

194.   Carpenter also requested backup documentation to explain or otherwise justify the above charges and uses of Rocket Exteriors' monies.

195.   Butcher and Asgard initially responded by cutting off Plaintiffs' access to Rocket Exteriors' accounting software and falsely claiming that the accounting software was experiencing "issues" that prevented Plaintiffs from having continued access.

196.   Butcher and Asgard also refused to provide, and to date have failed to provide, such documentation.

197.   Instead, Butcher and Asgard began requesting additional actions and consideration above and beyond the terms of the Purchase Agreement before Butcher and Asgard would acknowledge that Asgard was no longer a member of Rocket Exteriors.

198.   First, Butcher and Asgard insisted that Carpenter sign additional documents to consummate the sale and that their attorneys, Maddin, Hauser, Heller & Roth, P.C., would be sending over additional documents—prepared by Maddin Hauser—for Carpenter and Rocket Exteriors to sign.

199.   Nearly half a year elapsed without Butcher and Asgard—or their counsel— sending over any additional documents for Carpenter regarding his purchase of Asgard's interest.

200.    Then, on November 18, 2025, Maddin Hauser provided the following four documents (collectively, the "**Proposed Agreements**") to Carpenter and Rocket Exteriors to sign via Docusign:

    a.    Membership Interest Purchase Agreement, with a backdated "effective date" of January 1, 2025;

    b.    Assignment of Membership Interest in Rocket Exteriors LLC, with a backdated "effective date" of January 1, 2025;

    c.    Membership Interest Pledge Security Agreement, with a backdated "effective date" of January 1, 2025; and

    d.    Promissory Note, with a backdated date of January 1, 2025.

201.    Butcher made clear he would cease asserting Asgard's ownership interest in Rocket Exteriors unless Carpenter signed the Proposed Agreements, drafted by Butcher's counsel, despite Carpenter receiving no additional consideration beyond the Purchase Agreement.

202.    Even though Carpenter had already purchased Asgard's membership interest in Rocket Exteriors pursuant to the Purchase Agreement, Carpenter and Rocket Exteriors needed Butcher and Asgard to cease asserting that Asgard somehow still owned Rocket Exteriors despite the Purchase Agreement.

203.    As such, on November 18, 2025, Carpenter electronically signed all four Proposed Agreements via Docusign—on behalf of Rocket Exteriors and on behalf of Carpenter individually.

204.    Multiple days passed without any countersignature from Butcher or Asgard.

205. On November 21, 2025, Butcher texted Carpenter three "options": a) Carpenter could pay Butcher an additional $20,000.00 above and beyond the Purchase Price; b) Carpenter could "sign over" Rocket Exteriors to Butcher and "start a new career"; or c) "legal battle."

206. Butcher's associate, Brian Humenay, personally spoke with Carpenter and made clear that if Carpenter and Rocket Exteriors refused to pay Butcher an additional $20,000.00, then Butcher would not disclaim Asgard's interest in Rocket Exteriors.

207. Butcher's actions—including first demanding that Carpenter sign the Proposed Agreements despite the existence of the April 2, 2025 Purchase Agreement, and Butcher's later demand that Carpenter pay Butcher more money related to the sale of Asgard's interest—were intended to interfere with the orderly transition and operation of Rocket Exteriors.

208. In December of 2025, Carpenter and Rocket Exteriors retained undersigned counsel.

209. On December 17, 2025, undersigned counsel sent Butcher's and Asgard's counsel, Maddin Hauser, correspondence regarding a) the Proposed Agreements; b) Butcher and Asgard's failure to sign documents that their own counsel drafted; c) Butcher's remarkable demand for additional money above and beyond the Purchase Price; and d) formal notice revoking Rocket Exteriors' and Carpenter's signatures on all four of the Proposed Agreements. **Exhibit 3**.

210.    On December 18, 2025, undersigned counsel spoke with Maddin Hauser's lead counsel on the matter, David B. Deutsch, who informed undersigned that Maddin Hauser would no longer be representing Butcher or Asgard based on recent developments. **Exhibit 4**.

VIII.    **Plaintiffs discover that Butcher is unfairly competing against them: Butcher renames one of his companies "Rocket Service Pros" and engages in a scheme of unfair competition, including trademark infringement, misappropriation of trade secrets, and violation of the 2023 Partner Agreements' restrict covenants.**

A.    **Trademark infringement**.

211.    Defendant Modoc Mechanical LLC is one of Butcher's many companies.

212.    On September 30, 2025, Butcher filed with the State of Michigan paperwork by which Modoc Mechanical LLC assumed the business name "Rocket Service Pros." **Exhibit 5**.

213.    Rocket Service Pros ("**Rocket Service**") is similarly named to Rocket Exteriors.

214.    Butcher renamed Modoc Mechanical to Rocket Service Pros to confuse the public as to the source of Rocket Services goods and services and, ultimately, to unfairly divert business from Rocket Exteriors to Rocket Service.

215.    On top of this name change, Butcher took other actions to ensure that the public was confused such that they would do business with Rocket Service rather than Rocket Exteriors.

216.    For instance, in September of 2025, Butcher and Rocket Service began using, and infringing upon, Rocket Exteriors' longstanding trademark rights.

217.    Starting in 2020—within weeks of Rocket Exterior's incorporation—Rocket Exteriors started using its trade name, Rocket Exteriors, to market, sell, and provide services.

218.    Rocket Exterior's use of its trade name to market, sell, and provide services and goods has been continuous from 2020 to the present day.

219.    Since 2020, and continuing through the present day, Rocket Exteriors has also consistently and continuously used its distinctive company logo, set forth below, in interstate commerce:



*Figure 4*

220.    Rocket Exteriors' above company logo in Figure 4 is a distinctive and protectible design mark.

221.    Rocket Exteriors has used its above trade name and above company logo set forth in Figure 4 (collectively, the "**Marks**") in a variety of ways, including in recruiting, advertising, marketing, branding, selling its services, on employee uniforms, on apparel, and on company vehicles.

222.    Rocket Exteriors' Marks constitute protectable service marks.

223.    Rocket Exteriors' Marks identify the source of Rocket Exteriors' services.

35

224.    From Rocket Exteriors' inception in 2020 to the present date, Rocket Exteriors has used the Marks while providing its services throughout Michigan, including within the counties of Oakland, Wayne, Livingston, Macomb, Washtenaw, and Kent.

225.    Rocket Exteriors also uses the Marks in interstate commerce in the United States of America in to, among things, advertise, market, and seek business, including in Michigan, Florida, and via the Internet.

226.    Rocket Exteriors has advertised and promoted the Marks in interstate commerce in the United States since at least 2020.

227.    Rocket Exteriors uses the Marks in various channels of commerce—including at tradeshows, industry events, online (including social media), and marketing-driven channels—to market, advertise, brand, and sell Rocket Exteriors' services to consumers.

228.    Rocket Exteriors' customers have hired Rocket Exteriors services offered under the Marks.

229.    Rocket Exteriors' types of customers include, but are not limited, commercial buildings, residential projects, multi-family buildings, government municipalities, cooperative and condominium communities/associations, property management companies, and single-family homeowners.

230.    Since introducing Rocket Exteriors' services branded with the Marks to the market, Rocket Exteriors has invested substantial time, effort, and money in advertising and promoting their services throughout the United States of America.

231.    Rocket Exteriors' services branded under the Marks have a reputation for quality and excellence in Rocket Exteriors' industry general, as well as among Rocket Exteriors' customers specifically.

232.    Rocket Exteriors has established extensive goodwill in the Marks among Rocket Exteriors' customers and in Rocket Exteriors' industry.

233.    The Marks, and their associated goodwill, have become assets of substantial value to Rocket Exteriors.

234.    The below-referenced photographs in Figures 5 and 6 are indicative examples of Rocket Exteriors using the Marks, via Internet, to display the Marks on Rocket Exteriors' employee uniforms and in marketing materials:



*Figure 5*



*Figure 6*

235.    The below-referenced photograph in Figure 7 is an indicative example of Rocket Exteriors using the Marks on its company service vehicles:



*Figure 7*

236.    The below-referenced photograph in Figure 8 is an indicative example of Rocket Exteriors using the Marks on apparel and goods—such as hats, jackets, shirts, polos, golf balls, cups, and the like—that Rocket Exteriors distributes to both its staff and to the consuming public as part of its branding, marketing, and sales efforts:



*Figure 8*

237.    The below-referenced online advertisement in Figure 9 is an indicative example of Rocket Exteriors using the Marks in recruiting activites:



*Figure 9*

238.   Rocket Service, like Rocket Exteriors, also provides HVAC, plumbing, and electrical construction services.

239.   Despite Rocket Exteriors' Marks, and rights in those Marks, Rocket Service is improperly and unlawfully using the Marks—including through use of the Infringing Marks— to advertise, market, promote, brand, and sell Rocket Service's services, as well as to recruit personnel.

240.   As shown below in Figures 10 and 11, Rocket Service is using the Infringing Marks, including as set forth below in Figure 11, which unlawfully incorporate and infringe upon Rocket Exteriors' Marks and are confusingly similar to the Marks:

40

| Rocket Exteriors' Use of Its Marks: | Rocket Service's Infringing Marks: |
|---|---|
|  | |
| Figure 10 | Figure 11 |

241.    Butcher and Rocket Service are intentionally using the Infringing Marks to unfairly compete against Rocket Exteriors, divert Rocket Exteriors' customers, and to mislead and confuse the public as to the origin and source of Rocket Service's services.

242.    Butcher and Rocket Service recently launched a website, located online at www.rocketservicepros.com, that prominently and repeatedly uses the Infringing Marks to market, promote, and sell Rocket Service's services, as set forth below in Figure 12:



*Figure 12[2]*

243.     Butcher and Rocket Service are also using the Infringing Marks on social

media platforms, including on LinkedIn, as depicted below in Figure 13:



*Figure 13*

244.     Butcher and Rocket Service are also using the Infringing Marks on Rocket

Service's service vehicles, as shown below in Figure 14:



*Figure 14*

---

[2] **https://perma.cc/45JR-4X3C** [captured January 2, 2026].

245. As prominently displayed on www.rocketservicepros.com, Rocket Service's LinkedIn page in Figure 13, and Rocket Service's above service vehicle in Figure 14, Rocket Service provides HVAC, plumbing, and electrical services.

246. Rocket Exteriors has also historically provided, and seeks to continue to provide, a wide range of construction-related services throughout Michigan, including HVAC, electrical, and plumbing services, among others.

247. At no point in time have Plaintiffs consented or permitted Rocket Service to use the Marks.

248. At no point in time have Plaintiffs consented or permitted Butcher to use the Marks in connection with Rocket Service or any other company beyond Rocket Exteriors.

249. Dating back to 2023, Rocket Exteriors was headquartered at, and conducted business out of, the Livonia Building located at 32553 Schoolcraft Rd., Livonia, Michigan 48150.

250. Following Carpenter's April 2, 2025 purchase of Asgard's membership interest in Rocket Exteriors, Carpenter relocated Rocket Exteriors' headquarters from Livonia, Michigan, to 8308 Alta Vista Dr, Pinckney, Michigan 48169 (the "**Pinckney Office**").

251. However, and critically, Rocket Service is currently headquartered at, and operating out of, the *same* Livonia Building at which Rocket Exteriors previously operated.

252. As such, any existing or potential customer of Rocket Exteriors who now visits the Livonia Building would a) be confused and deceived regarding Rocket Service's identity

and the source of its services; and b) be confused and deceived into believing that Rocket Service was in fact Rocket Exteriors.

### B.   Violation of 2023 Partner Agreement's covenants.

253.   On top of Butcher's and Rocket Service's above willful trademark infringement, Butcher is also causing Rocket Service to compete against Rocket Exteriors, and to solicit and to service Rocket Exteriors' customers, in violation of the 2023 Partner Agreement's non-competition and non-solicitation covenants.

254.   As set forth above, the 2023 Partner Agreement contains a one-year covenant that prohibits Butcher and Asgard from, "directly or indirectly," competing with Rocket Exteriors within a sixty (60) mile radius of Rocket Exteriors "with respect to any of the business activities conducted or engaged in by" Rocket Exteriors. **Ex. 2**, § 11.2.4.

255.   As the crow flies, the Pinckney Office is 24.82 miles from the Livonia Office.

256.   Rocket Service's headquarters are well within the 60-mile radius of the Pinckney Office.

257.   Butcher and Asgard, both directly and indirectly, are competing with Rocket Exteriors within the prohibited 60-mile radius and in violation of the 2023 Partner Agreement's above non-competition covenant, including, by way of example, via Butcher's involvement with, operation of, and ownership of Rocket Service.

258.   As set forth above, the 2023 Partner Agreement also contains a one-year covenant that prohibits Butcher and Asgard from, "directly or indirectly," soliciting, providing services to, or selling products to any Rocket Exteriors' customer. **Ex. 2**, §§ 11.2.2 and 11.2.3.

259.   Butcher and Asgard, both directly and indirectly, are soliciting, and providing services, Rocket Exteriors' customers in violation of the 2023 Partner Agreement's above non-solicitation covenant, including, by way of example, via Butcher's involvement with, operation of, and ownership of Rocket Service.

### C.   Trade secret misappropriation.

260.   On top of Butcher's and Rocket Service's above willful trademark infringement, and Butcher's and Asgard's violation of the 2023 Partner Agreement's covenants, Butcher and Rocket Service have also misappropriated and used Rocker Exteriors' trade secrets, namely its customer and prospect lists and data, in order to solicit customers through Rocket Service Pros.

261.   As part of Butcher's and Asgard's ownership and management of Rocket Exteriors, Butcher and Asgard were required to execute both a 2020 Partner Agreement and a 2023 Partner Agreement, both of which contain confidentiality, non-use, and non-disclosure covenants and obligations.

262.   For example, as set forth above, the 2023 Partner Agreement contains confidentiality, non-disclosure, and non-use covenant that prohibits Butcher and Asgard from,

"directly or indirectly," disclosing or using any of Rocket Exteriors' confidential information. **Ex. 2**, § 11.3.

263.    The 2023 Partner Agreement defines confidential information to specifically include Rocket Exteriors' "trade secrets," "customer lists," "prospect lists," "contact lists," "pricing of the Company's and its subsidiaries' products," "customer buying patterns and needs," "information regarding trademarks or other intellectual property rights," "compilations of information of the Company," among other types of information and documentation. **Ex. 2**, § 11.1.2.

264.    The 2023 Partner Agreement also mandates that Butcher return all of Rocket Exteriors' confidential information upon Butcher's exit from Rocket Exteriors. **Ex. 2**, § 11.3.

265.    While the Marks themselves, of course, are not trade secrets, the information underlying the Marks—including deployment strategies, marketing strategies, branding strategies, and the electronic files to use or modify the Marks—individually and collectively constitute trade secrets under Michigan law (collectively, the "**Trademark Trade Secrets**").

266.    Butcher and Asgard, as part of their involvement with Rocket Exteriors, had access to allow of these trademark-related trade secrets.

267.    Butcher also directed staff to compile, store, and save Rocket Exteriors' customer information, lead information, and project information.

268.    For example, Butcher directed staff to compile, store, and save Rocket Exteriors' information and data pertaining to prospective customers of Rocket Exteriors.

269.    Butcher also directed staff to compile and save information pertaining to Rocket Exteriors' existing customer information, project details, pricing information, contact information, and customer preferences for certain services.

270.    Rocket Exteriors existing customer information was stored in Rocket Exteriors' Customer Relationship Management software, Acculynx and Google Forms (which includes client names, phone numbers, addresses, and other valuable information).

271.    The aforementioned customer, prospective customer, and project information and related documents, individually and collectively, constitute trade secrets under Michigan law (the "**Customer and Project Trade Secrets**").

272.    Rocket Exteriors devoted substantial resources, including money, research, and labor, to develop the Trademark Trade Secrets and the Customer and Project Secrets in order to gain an economic, competitive advantage over similarly situated competitors.

273.    Indeed, over the years, Butcher caused Rocket Exteriors to pay hundreds of thousands of dollars in revenue for marketing and customer lead generation, including paying a marketing firm to generate Rocket Exteriors' customer leads, for online advertising, and other customer lead generation.

274.    Rocket Exteriors also paid thousands of dollars to create the Marks and thereafter to use and promote the Marks such that the Marks developed substantial goodwill.

275.   At all relevant times during Butcher's and Asgard's management and ownership of Rocket Exteriors, Butcher and Asgard had access to the Trademark Trade Secrets and Customer and Project Trade Secrets.

276.   Following Butcher's exit from Rocket Exteriors in April of 2025, Butcher and Asgard failed to return Rocket Exteriors' confidential information, including the Trademark Trade Secrets and Customer and Project Trade Secrets in violation of the 2023 Partner Agreement.

277.   Instead, Butcher and Asgard misappropriated, and improperly used, the Trademark Trade Secrets and Customer and Project Trade Secrets, including via Butcher's involvement with, operation of, and ownership of Rocket Service and Butcher's other affiliate companies named as Defendants in this lawsuit.

### D.   Butcher's theft of tangible and intangible property.

278.   In addition to Butcher's trademark infringement, misappropriation of trade secrets, and breach of the 2023 Partner Agreement, Butcher and Asgard have converted, and exercised wrongful dominion over, both intangible and tangible property belonging to Rocket Exteriors, including the following items:

a.   Rocket Exteriors' website domain, login credentials, and website contents.

b.   Rocket Exteriors' email accounts, login credentials, and historical emails.

c.   Rocket Exteriors' social media accounts and login credentials.

d.   Rocket Exteriors' Google Drive account, login credentials, and its content, including project and customer-related information.

e.   Rocket Exteriors' tools, materials, and equipment, located at the Plymouth Building and to which Rocket Exteriors has been denied access.

f.   Rocket Exteriors' financial documentation for 2020–2025, including tax records, company ledger, profit & loss statements, balance sheets, and other financial records and reports.

g.   Vehicle titles to Rocket Exteriors' vehicles and trailers, including Chevy Silverado and other vehicles and trailers.

279.   As a direct result of Defendants' above actions, individually and collectively, Defendants have damaged Plaintiffs, including the loss of revenue, customers, and potential customers.

280.   Further, Butcher, Asgard, and Rocket Service's actions threaten imminent and irreparable harm to Plaintiffs, including the loss of customer goodwill and damage to Rocket Exteriors' brand and image.

## COUNT I
## BREACH OF THE 2023 PARTNER AGREEMENT
### [against Butcher and Asgard only]

281.   Plaintiffs incorporate their preceding allegations as if fully restated below.

282.   The 2023 Partner Agreement is a valid and enforceable contract.

283.   As set forth above, Butcher and Asgard violated the 2023 Partner Agreement, including, without limitation, the following provisions:

a. The Section mandating that Asgard and Butcher discharge their duties "in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances in a manner they reasonably believe to be in the best interests" of Rocket Exteriors. **Ex. 2**, § 4.4.

b. The Section prohibiting Asgard and Butcher from entering into any agreements with Rocket Exteriors "without the prior approval of all of the Members" of Rocket Exteriors, including Carpenter. *Id.*, § 4.4.

c. The Section prohibiting Asgard and Butcher from engaging in actual or potential conflicts of interest. *Id.*, § 4.3.5.

d. The Section involving Asgard and Butcher's obligation not to compete with Rocket Exteriors within sixty (60) miles of Rocket Exteriors. *Id.*, § 11.2.4.

e. Those Sections involving Asgard and Butcher's obligations not to solicit Rocket Exteriors' customers. *Id.*, §§ 11.2.2 and 11.2.3.

f. The Section prohibiting Butcher and Asgard from disclosing or using Rocket Exteriors' confidential information, including the Trademark Trade Secrets and Customer and Project Trade Secrets. *Id.*, § 11.3.

g.　The Section mandating that Butcher return Rocket Exteriors'
confidential information, including the Trademark Trade Secrets and
Customer and Project Trade Secrets. *Id.*, § 11.3.

h.　The Sections mandating that Butcher and Asgard keep "true, exact and
complete books and records of the business and affairs of" Rocket
Exteriors. *Id.*, §§ 5.1.1 and 5.1.2.

i.　The Section mandating that Butcher and Asgard "enter fully and
accurately each and every transaction of" Rocket. *Id.*, § 5.1.2.

j.　The Section mandating that Butcher and Asgard "prepare and transmit
to all Members a schedule of income tax information as required by all
taxing authorities." *Id.*, § 5.2.

k.　The Section mandating that Butcher and Asgard make annual
membership distributions to Carpenter. *Id.*, § 7.2.

284.　Butcher's and Asgard's violations of the 2023 Partner Agreement damaged
Plaintiffs.

285.　Butcher's and Asgard's violations of the 2023 Partner Agreement entitle
Plaintiffs "actual attorneys fees and costs incurred" by Rocket Exteriors. **Ex. 2**, § 11,4,2,

286.　Butcher's and Asgard's violations of the 2023 Partner Agreement's non-
competition, non-solicitation, non-disclosure, and non-use covenants also threaten imminent

and irreparable harm to Rocket Exteriors and Carpenter, including in the form of lost customer goodwill.

287.   Butcher's and Asgard's violations of the 2023 Partner Agreement's non-competition, non-solicitation, non-disclosure, and non-use covenants entitle Plaintiffs to "injunctive and other forms of equitable relief (including preliminary and mandatory injunctive relief, without the posting of any bond or other security) to prevent such breach, along with the actual attorney fees and costs incurred by" Rocket Exteriors to obtain such relief. **Ex. 2**, § 11.4.2 and 11.4.3.

288.   Butcher's and Asgard's violations of the 2023 Partner Agreement's non-competition, non-solicitation, non-disclosure, and non-use covenants entitle Plaintiffs to equitable tolling by which the 2023 Partner Agreement's restrictive covenants "shall be extended for a period of time equal to (i) the duration of such violation or breach and (ii) any legal proceeding pertaining to any violation of breach." **Ex. 2**, § 11.5.

## COUNT II
### Statutory Conversion
### [against all Defendants]

289.   Plaintiffs incorporate their preceding allegations as if fully restated below.

290.   Michigan statute prohibits the following conduct:

    a.    Another person's **stealing** or **embezzling** property or converting property to the other person's own use;

    b.    Another person's buying, **receiving**, **possessing**, **concealing**, or **aiding in the concealment of stolen, embezzled, or converted property** when the person buying, receiving, possessing, concealing,

or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

MCL 600.2919a(1) (emphases added).

291.    Rocket Exteriors is the sole and rightful owner of the above-referenced monies that Butcher, Asgard, and Stark Enterprises, either directly or indirectly, wrongfully and fraudulently caused to be paid to Butcher's many affiliate companies named as co-defendants in this matter, including to Butcher himself, to Asgard, to Stark Enterprises, to Cross Construction Group, Inc., to Beast Craftsmen, to Blaze HoldCo, and to Butcher & Butcher.

292.    Rocket Exteriors is also the sole and rightful owner of the above-referenced tangible and intangible property converted by Butcher and Asgard, including the following property:

a.    Rocket Exteriors' website domain, login credentials, and website contents.

b.    Rocket Exteriors' email accounts, login credentials, and historical emails.

c.    Rocket Exteriors' social media accounts and login credentials.

d.    Rocket Exteriors' Google Drive account, login credentials, and its content, including project and customer-related information.

e.    Rocket Exteriors' tools, materials, and equipment, located at the Plymouth Building and to which Rocket Exteriors has been denied access.

f.    Rocket Exteriors' financial documentation for 2020–2025, including tax records, company ledger, profit & loss statements, balance sheets, and other financial records and reports.

g.    Vehicle titles to Rocket Exteriors' vehicles and trailers, including Chevy Silverado and other vehicles and trailers.

(collectively, the "**Tangible and Intangible Property**").

293.   As alleged in detail above, Defendants unlawfully, knowingly, and intentionally stole and converted Rocket Exteriors' above-referenced monies for their own use and benefit, in violation of MCL 600.2919a(1)(a).

294.   As alleged in detail above, Defendants unlawfully, knowingly, and intentionally received, possessed, and concealed Rocket Exteriors' above-referenced monies, in violation of MCL 600.2919a(1)(b).

295.   As alleged in detail above, Defendants unlawfully, knowingly, and intentionally aided in the concealment of Rocket Exteriors' stolen, embezzled, and converted above-referenced monies, in further violation of MCL 600.2919a(1)(b).

296.   As alleged in detail above, Butcher and Asgard have also unlawfully, knowingly, and intentionally stole and converted Rocket Exteriors' above-defined Tangible and Intangible Property for their own use and benefit, in violation of MCL 600.2919a(1)(a).

297.   Defendants converted Rocket Exteriors' monies and Tangible and Intangible Property without Rocket Exteriors' permission.

298.   Defendants' violations of MCL 600.2919a, individually and collectively, caused Rocket Exteriors to sustain actual damages, plus costs and attorney fees.

299.    Rocket Exteriors is statutorily entitled to recover from Defendants "3 times the amount of actual damages sustained, plus costs and reasonable attorney fees."   MCL 600.2919a(1).

### COUNT III
### Common Law Conversion
### [against all Defendants]

300.    Plaintiffs incorporate their preceding allegations as if fully restated below.

301.    Defendants' above transfer and receipt of Rocket Exteriors' above-referenced monies and Tangible and Intangible Property were inconsistent with Rocket Exteriors' property rights in these monies.

302.    Defendants' above transfer and receipt of Rocket Exteriors' above-referenced monies constitute common law conversion under Michigan law.

303.    Defendants' intentionally converted Rocket Exteriors' above-referenced monies and Tangible and Intangible Property.

304.    Defendants' above acts of conversion, individually and collectively, caused Rocket Exteriors to sustain actual damages, including the loss the above-referenced monies, loss of use of the Tangible and Intangible Property, and disruption to Rocket Exteriors' business and operations, plus costs and attorney fees.

### COUNT IV
### Fraud and Fraudulent Misrepresentations
### [against all Butcher, Asgard, and Stark Enterprises only]

305.    Plaintiffs incorporate their preceding allegations as if fully restated below.

306.    As set forth above, Butcher, Asgard, and Stark Enterprises repeatedly made false representations to Plaintiffs, including by way of example, regarding, related to the following:

    a.    The alleged financial condition of Rocket Exteriors and reasons for its financial condition;

    b.    Falsified monthly "financial reports" purporting to accurately identify Rocket Exteriors' financial performance, including revenues and expenses that Rocket Exteriors was allegedly incurring;

    c.    The alleged use of Rocket Exteriors' funds;

    d.    The alleged amount of money that Butcher was paying to co-defendants, including for alleged "management fees" paid to Stark Enterprises and Asgard, alleged "payroll fees" paid to Stark Enterprises and Beast Craftsmen, and alleged "rent" paid to Butch & Butcher; and

    e.    The alleged purposes for why Butcher was causing Rocket Exteriors to pay co-defendants, including for alleged "management fees" paid to Stark Enterprises and Asgard, alleged "payroll fees" paid to Stark Enterprises and Beast Craftsmen, and alleged "rent" paid to Butch & Butcher.

307.    Butcher, Asgard, and Stark Enterprises made these false representations, and presented the above falsified monthly "financial reports," to Carpenter, including in Carpenter's capacity as a member and co-owner of Rocket Exteriors.

308.    Butcher, Asgard, and Stark Enterprises' above representations and presentation of the falsified monthly "financial reports" were intentionally false and designed to deceive Plaintiffs.

309.    Butcher, Asgard, and Stark Enterprises knew they were falsely making these misrepresentations, and presenting falsified monthly "financial reports," to Plaintiffs, at the time Butcher, Asgard, and Stark Enterprises' made these misrepresentations.

310.    Butcher, Asgard, and Stark Enterprises made these misrepresentations, and presented the falsified monthly "financial reports," to deceive Plaintiffs into inaction and to facilitate Defendants' remarkable conversion and embezzlement of Rocket Exteriors' revenues.

311.    Plaintiffs in fact relied on Butcher, Asgard, and Stark Enterprises' above misrepresentations and falsified monthly "financial reports."

312.    Butcher, Asgard, and Stark Enterprises' aforementioned misconduct constitutes fraud against Plaintiffs, for which Butcher, Asgard, and Stark Enterprises are liable to Plaintiff.

313.    Butcher, Asgard, and Stark Enterprises' above misrepresentations to Plaintiffs also constitute fraudulent misrepresentations, for which Defendants are liable to Plaintiff.

314.    As a direct and proximate result of Defendants' fraud and fraudulent misrepresentations, Plaintiffs suffered, and continues to suffer, injuries and damages, including, but not limited to, economic losses and noneconomic losses, including monetary damages, loss of revenues, time and resources, mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment, loss of self-esteem, anxiety, outrage, and loss of personal and professional reputation.

315.    Butcher, Asgard, and Stark Enterprises' fraud and fraudulent misrepresentations entitle Plaintiffs to exemplary damages, punitive damages, and attorney's fees.

316.    Butcher, Asgard, and Stark Enterprises are jointly and severally liable for their fraud and fraudulent misrepresentations to Plaintiffs.

## COUNT V
### Violation of Michigan's Uniform Trade Secrets Act
### [against all Defendants]

317.    Plaintiffs incorporate their preceding allegations as if fully restated below.

318.    Plaintiffs gave Butcher and Asgard access to Rocket Exteriors' Trademark Trade Secrets.

319.    Plaintiffs gave Butcher and Asgard access to Rocket Exteriors' Customer and Project Trade Secrets.

320.    The Trademark Trade Secrets and Customer and Project Trade Secrets, individually and collectively, constitute trade secrets under Michigan law (collectively, "**Rocket Exteriors' Trade Secrets**").

321.    As explained above, Rocket Exteriors paid hundreds of thousands of dollars to generate Rocket Exteriors' Trade Secrets.

322.    As explained above, Rocket Exteriors devoted substantial resources, including money, research, and labor, to develop Rocket Exteriors' Trade Secrets to gain an economic, competitive advantage over similarly situated competitors.

323.    Rocket Exteriors' Trade Secrets and Customer and Project Trade Secrets thus have independent economic value.

324.    Butcher and Asgard accessed, obtained, and used Rocket Exteriors' Trade Secrets in their capacity as member, manager, and owner of Rocket Exteriors.

325.    Rocket Exteriors' Trade Secrets were not otherwise known to Rocket Exteriors' competitors, nor were they readily ascertainable.

326.    Rocket Exteriors uses reasonable efforts to keep its Trade Secrets secret, including requiring Butcher and Asgard to sign the 2023 Partner Agreement, which contains confidentiality, non-disclosure, and non-use covenants pertaining to Rocket Exteriors' confidential information and Trade Secrets, along with an obligation to return these items upon exiting Rocket Exteriors.

327.    Defendants, in violation of Michigan's Uniform Trade Secrets Act, misappropriated Rocket Exteriors' above-referenced trade secrets.

328.    Defendants in violation of Michigan's Uniform Trade Secrets Act, divulged, disclosed, and communicated Rocket Exteriors' Trade Secrets.

329.    Defendants obtained Rocket Exteriors' Trade Secrets exclusively through Butcher's and Asgard's special relationship with Rocket Exteriors.

330.    Defendants' misappropriation and misuse of Rocket Exteriors' trade secrets permitted Defendants to unfairly and unlawfully divert business from Plaintiffs to Defendants.

331.    Defendants willfully and maliciously misappropriated, disclosed, and misused Rocket Exteriors' Trade Secrets in bad faith.

332.    Defendants' misappropriation, disclosure, and misuse of Rocket Exteriors' Trade Secrets damaged Rocket Exteriors.

333.    Defendants' misappropriation, disclosure, and misuse of Rocket Exteriors' Trade Secrets unjustly enriched Defendants, including loss of sales, revenue, and customer goodwill.

334.    Defendants' ongoing use and disclosure of Rocket Exteriors' Trade Secrets is a continuing violation of Rocket Exteriors' rights and threatens to irreparably harm Rocket Exteriors unless enjoined.

335.    Pursuant to MCL 445.1904, Rocket Exteriors is entitled to an award of both a) Rocket Exteriors' actual losses caused by Defendants' misappropriation; and b) disgorgement of Defendants' unjust enrichment caused by Defendants' misappropriation.

336.    Pursuant to MCL 445.1905, Rocket Exteriors is entitled to an award of reasonable attorney's fees.

## COUNT VI
## BREACH OF FIDUCIAY DUTIES
## [against Butcher and Asgard only]

337.    Plaintiffs incorporate their preceding allegations as if fully restated below.

338.    While Asgard was a member of Rocket Exteriors, Asgard owed Rocket Exteriors and Carpenter fiduciary duties, including, *inter alia*, the duty of loyalty, the duty of

care, the duty of honesty, the duty to disclose material facts, the duty of good faith and fair dealing, the duty to avoid conflicts of interest, and the duty not to self-deal.

339.    While Butcher managed Rocket Exteriors, Butcher owed Rocket Exteriors and Carpenter fiduciary duties, including, *inter alia*, the duty of loyalty, the duty of care, the duty of honesty, the duty to disclose material facts, the duty of good faith and fair dealing, the duty to avoid conflicts of interest, and the duty not to self-deal.

340.    Butcher and Asgard, individually and collectively, repeatedly breached their above fiduciary duties to Plaintiffs by engaging in the course of conduct exhaustively set forth above.

341.    Defendants' breaches of their fiduciary duties have damaged Plaintiffs.

<u>COUNT VII</u>
**Violation of the Lanham Act – False Designation of Origin and Unfair Competition**
**15 U.S.C. § 1125(a)**
**[against all Butcher and Rocket Service]**

342.    Plaintiffs incorporate their preceding allegations as if fully restated below.

343.    Despite Rocket Exteriors' prior rights in the Marks, Butcher and Rocket Service have knowingly used in commerce Rocket Exteriors' Marks, or copies, reproductions, or colorable imitations thereof, including the Infringing Marks, in connection with the services that Butcher and Rocket Service advertise, promote, and sell.

344.    Butcher and Rocket Service's actions render this case exceptional within the meaning of 15 U.S.C. § 1117(a).

61

345.    As alleged above, Butcher and Rocket Service misappropriation of Rocket Exteriors' Marks, or copies, reproductions, or colorable imitations thereof, including the Infringing Marks, is likely to confuse, mislead, or deceive customers, purchasers, and members of the general public as to the origin, source, sponsorship, or affiliation of Rocket Exteriors' products and services, and is likely to cause such people to believe in error that Butcher and Rocket Service's products, services, and policies have been authorized, sponsored, approved, endorsed, or licensed by Rocket Exteriors or that Rocket Exteriors is in some way affiliated with Butcher and Rocket Service.

346.    Butcher and Rocket Service's acts constitute false designations of the origin and/or sponsorship of Butcher and Rocket Service's products, services, and policies in violation of Section 43(a) of the Lanham Act, as amended, 15 U.S.C. § 1125(a).

347.    Butcher and Rocket Service's acts also constitute unfair competition under the Lanham Act.

348.    By reason of Butcher and Rocket Service's actions, Rocket Exteriors has suffered irreparable harm to its Marks.

349.    Unless Defendants are restrained from their actions, Rocket Exteriors will continue to be irreparably harmed.

350.    Rocket Exteriors has no remedy at law that will compensate for the continued and irreparable harm that will be caused if Butcher and Rocket Service's acts are allowed to continue; Rocket Exteriors is thus entitled to both a preliminary and permanent injunction.

351. As a direct and proximate result of Butcher and Rocket Service's conduct, Rocket Exteriors is entitled to damages, treble damages, statutory damages, the equitable remedy of an accounting for, and a disgorgement of all revenues wrongfully derived by Butcher and Rocket Service from their infringement of Rocket Exteriors' Marks pursuant to 15 U.S.C. § 1117.

## COUNT VIII
### Common Law Trademark Infringement
### [against Butcher and Rocket Service]

352. Plaintiff incorporates the preceding allegations as if fully restated below.

353. Rocket Exteriors has common law rights in the Marks based at least upon continuous use of the Marks in the State of Michigan in connection with advertising, marketing, branding, provision of services, recruiting, apparel and merchandise, and other activities, directly or through others.

354. Butcher and Rocket Service's unauthorized use of Rocket Exteriors' Marks, or copies, reproductions, or colorable imitations thereof, including the Infringing Marks, to promote, advertise, market, and/or sell its goods and/or services is likely to cause confusion, mistake, and deception of the public as to the identity and origin of Defendants' goods and services, or as to a connection or affiliation with Rocket Exteriors, or permission from Rocket Exteriors, that does not exist, causing irreparable harm to Rocket Exteriors for which there is no adequate remedy at law.

355.    Butcher and Rocket Service's conduct thus constitutes common law infringement of Rocket Exteriors' Marks.

356.    Despite Rocket Exteriors' prior rights in the Marks, and despite Butcher and Rocket Service's knowledge of Rocket Exteriors' ownership and prior use of the Marks, Butcher and Rocket Service have continued to use the Marks, or copies, reproductions, or colorable imitations thereof, including the Infringing Marks, without Rocket Exteriors' authorization.

357.    Butcher and Rocket Service's actions are deliberate and willful and have been done with the intention of trading upon the valuable goodwill, identity, and image built up by Rocket Exteriors in the Marks.

358.    Rocket Exteriors has sustained injury, damage, and loss based on Butcher and Rocket Service's actions.

## COUNT IX
### Common Law Unfair Competition
### [against all Butcher, Rocket Service, and Asgard]

359.    Plaintiffs incorporate their preceding allegations as if fully restated below.

360.    Defendants' aforementioned misconduct and scheme are unethical and unfair to Plaintiffs.

361.    It is inherently unfair and unethical for Butcher and Asgard to sell Asgard's membership in Rocket Exteriors while Butcher and his other company, Rocket Service, simultaneously infringe on Rocket Exteriors' Marks and palm off Rocket Exteriors' Marks.

362.   Butcher and Asgard are engaging in this unfair and unethical behavior in flagrant violation of the 2023 Partner Agreement's non-competition, non-solicitation, confidentiality, non-use, and non-disclose covenants.

363.   Butcher, Rocket Service, and Asgard are engaging in this unfair and unethical behavior by using Rocket Exteriors' Trade Secrets to unfairly compete.

364.   Butcher, Rocket Service, and Asgard's aforementioned misconduct and scheme—including Defendants' sordid combination of conversion, embezzlement, fraud, covenant breaches, trade secret misappropriation, and trademark infringement—constitute unfair competition under Michigan common law.

365.   Butcher, Rocket Service, and Asgard aforementioned misconduct is likely to confuse, mislead, or deceive customers, purchasers, and members of the general public as to the origin, source, sponsorship, or affiliation of Rocket Exteriors' products and services, and is likely to cause such people to believe in error that Butcher and Rocket Service's products, services, and policies have been authorized, sponsored, approved, endorsed, or licensed by Rocket Exteriors or that Rocket Exteriors is in some way affiliated with Butcher and Rocket Service

366.   Butcher, Rocket Service, and Asgard above conduct threatens injury and irreparable harm to Rocket Service's business, including loss of customer goodwill and damage to Rocket Exteriors' brand and image.

367.     As a direct and proximate result of Defendants' above unfair competition, Rocket Exteriors has lost customer goodwill, revenue, and experienced financial damages.

**COUNT X**
**Unjust Enrichment and Restitution**
**[against all Defendants]**

368.     Plaintiffs incorporate their preceding allegations as if fully restated below.

369.     Plaintiffs conferred benefits on Defendants, including Butcher taking actions to illicitly, unethically, and illegally transfer Rocket Exteriors' money and assets to Butcher and the other co-defendants in this matter, all of which are either directly owned by, or affiliates of, Butcher.

370.     Defendants did not confer correlated benefits on Rocket Exteriors in exchange for receipt of Rocket Exteriors' money and assets.

371.     Rocket Exteriors' money and assets unjustly enriched Defendants given that the transfers were not authorized and given that Defendants provided no benefit in exchange for receipt of Rocket Exteriors' money and assets.

372.     Rocket Exteriors did not intend that Defendants would receive or retain these benefits, let alone without providing any consideration.

373.     Rocket Exteriors has otherwise acted equitably in this matter, such that Defendants must disgorge the aforementioned benefits to Rocket Exteriors or pay for the same in a just and equitable manner.

374.     Rocket Exteriors seek the remedy of disgorgement and restitution such that Defendants are disgorged of all monies, profits, and benefits they unjustly received at Rocket Exteriors' expense and detriment.

## COUNT XI
## Civil Conspiracy
## [against all Defendants]

375.     Plaintiffs incorporate their preceding allegations as if fully restated below.

376.     Defendants illegally, maliciously, and wrongfully conspired with one another, pursuant to a common scheme and concerted action, to accomplish the following unfair competition and other unlawful purposes:

   a.     Statutory and common law conversion, including embezzlement, in violation of MCL 600.2919a;

   b.     Stealing, and exercising wrongful dominion over, Rocket Exteriors' Tangible and Intangible Property in order to interfere with and disrupt Rocket Exteriors' business and to unfairly compete with Rocket Exteriors;

   c.     Committing the above-referenced fraud to deceive Plaintiffs into action and to avoid detection;

   d.     Scheming to impersonate Rocket Exteriors and to poach Rocket Exteriors' customers, leads, and prospects;

   e.     Signing the Purchase Agreement while simultaneously refusing to acknowledge its legal effect in an effort to sabotage and disrupt Rocket Exteriors' operations and ability to function;

   f.     Knowingly and intentionally violating the Partner Agreement, including its non-competition, non-solicitation, non-disclosure, non-use, and confidentiality covenants in order to unfairly compete with Rocket Exteriors;

g.   Infringing on Rocket Exteriors' Marks to deceive Rocket Exteriors' customers and thereby divert them from Rocket Exteriors to Rocket Service;

h.   Misappropriating and using Rocket Exteriors' Trade Secrets and other confidential information, in order to facilitate Defendants' conspiracy and unfair competition; and

i.   Acting to unjustly enrich themselves at the expense and detriment of Rocket Exteriors.

377.   As a direct and proximate result of Defendants' conspiracy, Defendants damaged Plaintiffs.

378.   Based on Defendants' civil conspiracy stated herein, Plaintiffs are entitled to actual, compensatory, non-economic, exemplary, special, and punitive damages, as well as attorney's fees and costs.

## COUNT XII
### DECLARATORY RELIEF AND JUDGMENT
### [against Butcher and Asgard only]

379.   The Purchase Agreement is a valid and enforceable contract.

380.   Pursuant to the Purchase Agreement, Asgard sold its membership interest in Rocket to Carpenter. **Ex. 1**, ¶ 1.

381.   To date, Carpenter has fully performed on the Purchase Agreement.

382.   Despite these facts, Butcher and Asgard refuse to acknowledge that, pursuant to the Purchase Agreement, Asgard is no longer a member of Rocket.

383.    Instead, Butcher and Asgard have demanded additional consideration above and beyond the Purchase Agreement before they will recognize that Asgard is no longer a member of Rocket.

384.    In other words, Plaintiffs' claims are adverse to Asgard's and Butcher's claims in connection with the Purchase Agreement and ownership in Rocket Exteriors.

385.    A declaratory judgment is necessary to guide Plaintiffs' future conduct and to persevere their legal rights, including making operational decisions and dealing with third parties relative to Rocket Exteriors' ownership.

386.    Based on the above facts and disagreements, an actual, substantial, and justifiable controversy exists between Plaintiffs and Defendants concerning the Purchase Agreement and ownership of Rocket Exteriors.

387.    Plaintiffs assert, and seek the following judgment, declarations, and injunctive relief from this Court, as follow:

    a.    An order and judgment declaring that, pursuant to the Purchase Agreement, Carpenter is the sole member and owner of Rocket Exteriors; and

    b.    An order and judgment declaring that, pursuant to the Purchase Agreement, Asgard and Butcher have no continuing legal interest in, or rights to, Rocket Exteriors.

## <u>REQUESTED RELIEF</u>

**FOR THESE REASONS**, Plaintiffs Jesse Carpenter and Rocket Exteriors LLC respectfully request the following legal and equitable relief against Defendants, and in favor of Plaintiffs:

1.    A money judgment in Plaintiffs' favor, and against Defendants, jointly and severally, in an amount that the jury finds Plaintiffs entitled to, including, without limitation, actual, treble, compensatory, exemplary, special, and punitive damages, plus interest, costs, expenses, and attorney's fees.

2.    A preliminary and permanent injunction that enjoins Butcher and Rocket Service, and any co-owners, members, employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, and entities owned or controlled by Butcher or Rocket Service, and all those in active concert or participation with Butcher and Rocket Service who receive notice directly or otherwise of such injunction from the following:

a)    using Rocket Exteriors' name, or any variation thereof, including the Infringing Marks;

b)    using the Marks or Infringing Marks, or any other marks that are confusingly similar to the Marks, for products or services, or making any other unlawful use of Rocket Exteriors' Marks or any other marks owned by Rocket Exteriors, and including any

70

use of the Marks in connection with any goods or services that are within the zone of natural business expansion of the goods and services of Rocket Exteriors;

c)   using any false designation of origin or false description, or performing any act which is likely to lead members of the trade or public to believe that any product manufactured, imported, distributed, offered for sale, or sold by Defendants, or any service offered by Defendants is in any manner associated or connected with Rocket Exteriors, or is licensed, sponsored, approved, or authorized by Rocket Exteriors, including based on use of the Infringing Marks;

d)   engaging in any other activity constituting unfair competition with Rocket Exteriors, or constituting infringement of Rocket Exteriors' Marks, including any use of the Marks or Infringing Marks in connection with any goods or services that are within the zone of natural business expansion of the goods and services of Rocket Exteriors;

e)   instructing, assisting, aiding or abetting any other person or entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (d) above.

3.   Direct such other action as the Court may deem appropriate to prevent the trade and public from deriving the erroneous impression that any goods or services offered, advertised, or promoted by or on behalf of Butcher or Rocket Service are authorized by Plaintiffs of related in any way to Rocket Exteriors' products or services.

4.      Within thirty (30) days after entry of judgment, direct that Butcher and Rocket Service file with the Court, and serve upon Plaintiffs' counsel, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the above Paragraphs 2(a)–(e) and 3.

5.      Award Rocket Exteriors its actual damages, including but not limited to disgorgement of Defendants' revenues, and trebled pursuant to 15 U.S.C. § 1117(a) & (b), arising out of Defendants' acts of willful infringement.

6.      Award Plaintiffs their actual damages, including but not limited to disgorgement of Defendants' revenues, trebled pursuant to 15 U.S.C. § 1117(a), arising out of Defendants' acts of willful false designation and unfair competition.

7.      Award Plaintiffs exemplary and punitive damages to deter any future willful infringement as the Court finds appropriate.

8.      Pursuant to MCL 445.1904, an award of both a) Rocket Exteriors' actual losses caused by Defendants' misappropriation of Rocket Exteriors' Trade Secrets; and b) disgorgement of Defendants' unjust enrichment caused by Defendants' misappropriation of Rocket Exteriors' Trade Secrets.

9.      Enter a preliminary, permanent, and mandatory injunction that enjoins Defendants, and any co-owners, members, employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, and entities owned or controlled by Defendants, and all those in active concert or participation with Defendants who

receive notice directly or otherwise of such injunction, from possessing, using, disclosing, or misappropriating Rocket Exteriors' confidential information or Trade Secrets.

10.     Enter a preliminary and permanent injunction that enjoins Butcher, Asgard, and Rocket Service, and any co-owners, members, employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, and entities owned or controlled by Butcher, Asgard, or Rocket Service, and all those in active concert or participation with Butcher, Asgard, and Rocket Service who receive notice directly or otherwise of such injunction from the following:

      a)     Competing, directly or indirectly, with Rocket Exteriors in violation of the 2023 Partner Agreement;

      b)     Soliciting, directly or indirectly, Rocket Exteriors customers in violation of the 2023 Partner Agreement

11.     Equitably toll the 2023 Partner Agreement's non-competition and non-solicitation covenants such that they are "extended for a period of time equal to (i) the duration of such violation or breach and (ii) any legal proceeding pertaining to any violation of breach."

12.     Award declaratory relief, including a declaratory judgment, as explained above.

13.     Award Plaintiffs their attorney's fees and costs in this civil action, including:

      a)     Actual attorney's fees and costs pursuant to the 2023 Partner Agreement.

b)      Actual attorney's fees and costs pursuant to Michigan's Statutory Conversation Statute, MCL 600.2919a.

c)      Reasonable attorney's fees and costs pursuant to Michigan's Uniform Trade Secrets Act, including pursuant to MCL 445.1905.

d)      Reasonable attorney's fees and costs pursuant to the Lanham Trademark Act of 1946, including pursuant to 15 U.S.C. § 1117(a) and (b).

14.      Award Plaintiffs interest, including pre-judgment and post-judgment interest, on the foregoing sums.

15.      Award Plaintiffs other further interim and final relief, including monetary damages and costs, as this Court deems justice and equity requires.

Respectfully submitted,

/s/ R.J. Cronkhite
R.J. Cronkhite (P78374)
Cronkhite Counsel PLLC
36800 Woodward Ave., Ste 310
Bloomfield Hills, MI 48304
*Attorneys for Plaintiffs*
T: (248) 309-8602
F: (248) 256-2555
rj@cronkhitelaw.com

Dated: January 7, 2026

## JURY DEMAND

Plaintiffs Jesse Carpenter and Rocket Exteriors LLC, through their attorneys Cronkhite Counsel PLLC, hereby demand a jury trial for all causes of action so triable by jury.

Respectfully submitted,

/s/ R.J. Cronkhite
R.J. Cronkhite (P78374)
Cronkhite Counsel PLLC
36800 Woodward Ave., Ste 310
Bloomfield Hills, MI 48304
*Attorneys for Plaintiffs*
T: (248) 309-8602
F: (248) 256-2555
rj@cronkhitelaw.com

Dated: January 7, 2026