UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROCKET EXTERIORS LLC and
JESSE CARPENTER,

        Plaintiffs,

                                          Case No. 26-cv-10057
v.                                 Honorable Linda V. Parker

MICHAEL D. BUTCHER, ASGARD
ROOFING LLC d/b/a ASGARD INVESTMENTS,
CONSULTING AND MANAGEMENT, LLC,
MODOC MECHANICAL LLC d/b/a ROCKET
SERVICE PROS, STARK ENTERPRISES LLC,
CROSS CONSTRUCTION GROUP, INC.
BEAST CRAFTSMEN, LLC,
BLAZE HOLDCO LLC, and BUTCHER AND
BUTCHER LLC,

        Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' "EMERGENCY MOTION FOR PRELIMINARY INJUNCTION" (ECF NO. 11)

On January 7, 2026, Plaintiffs Rocket Exteriors LLC and Jesse Carpenter filed this lawsuit against Defendants, asserting several claims arising from the parties' business dealings and Carpenter's purchase of Asgard Investments, Consulting and Management LLC's 50% interest in Rocket Exteriors.  Asgard Investments, Consulting and Management LLC ("Asgard") is owned and

controlled by Defendant Michael Butcher, as are the remaining entities named as Defendants.  In the Complaint, Plaintiffs allege the following claims:

(I)     Breach of the 2023 Partner Agreement against Butcher and Asgard;
(II)    Statutory conversion against all Defendants;
(III)   Common law conversion against all Defendants;
(IV)    Fraud and fraudulent misrepresentations against Butcher, Asgard, and Stark Enterprises LLC;
(V)     Violation of Michigan's Uniform Trade Secrets Act against all Defendants;
(VI)    Breach of fiduciary duties against Butcher and Asgard;
(VI)    False designation of origin and unfair competition in violation of the Lanham Act against Butcher and Rocket Service Pros;
(VIII)  Common law trademark infringement against Butcher and Rocket Service;
(IX)    Common law unfair competition against Butcher, Rocket Service Pros, and Asgard;
(X)     Unjust enrichment and restitution against all Defendants;
(XI)    Civil conspiracy against all Defendants; and
(XII)   Declaratory relief and judgment against Butcher and Asgard only.

(ECF No. 1.)

On February 13, Plaintiffs filed an "emergency" motion for preliminary injunction.  (ECF No. 11.)  Defendants filed a response brief (ECF No. 13), and Plaintiffs filed a reply brief (ECF No. 15) and a supplement (ECF No. 20).  The Court held a motion hearing on May 7, 2026.  For the reasons that follow, the Court is granting in part and denying in part Plaintiffs' request for a preliminary injunction.

## I.      Standard of Review

When a party moves for a preliminary injunction, the district court considers four factors to determine whether to grant relief: (1) the likelihood of success on the merits of the action; (2) the irreparable harm which could result without the requested relief; (3) the possibility of substantial harm to others; and (4) the impact on the public interest.  *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir. 1985).  "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Cooey v. Strickland*, 589 F.3d 210, 218 (6th Cir. 2009) (quoting *Mich. Coal. of Radioactive Materials Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)).

"[T]he preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.'"  *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991)).  Nevertheless, given that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held[,]" . . . . a preliminary injunction is customarily granted on the basis of procedures less formal and evidence less complete than in a trial on the merits."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Fetch! Pet*

*Care, Inc. v. Atomic Pawz, Inc.*, 170 F.4th 546, 554 (6th Cir. 2026) (citations omitted).  The party moving for the injunction has the burden to show that the circumstances clearly demand it.  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

Although the district court must balance and weigh the relevant preliminary injunction considerations, "a finding that there is simply no likelihood of success on the merits is usually fatal."  *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 223 F.3d 620, 625 (6th Cir. 2000).  Thus, the court is not required to make specific findings concerning each of the four factors if fewer factors are dispositive.  *In re DeLoreon Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

## II.     Factual Background

Butcher has been in the construction business for more than 25 years.  (ECF No. 21-2 at PageID.927-28 ¶¶ 5-11.)  In 2009, he started Cross Renovation ("Cross"), a general contracting company, which he managed until 2024.  (*Id*. at PageID.928 ¶¶ 10-11.)  Carpenter began working for Cross as an independent contractor in 2011.  (*Id*. ¶ 12.)

In 2014, Butcher formed Stark Enterprises LLC ("Stark"), a general contracting company, which also provided services to outside general contractors and construction managers.  (*Id*. ¶ 13.)  Butcher then split Cross' self-performing trades into individual trade companies to complete work for Stark.  (*Id*.)  From

4

2014 through 2022, Stark owned and was the parent company of those eight individual trade companies, which performed different building services: MODOC Mechanical LLC ("MODOC") (HVAC); Ultra Plumbing LLC (plumbing); Max Electric LLC (electric); ECO Painting LLC (interior and exterior painting); Resurrection Carpentry LLC (carpentry, interior framing, and drywall); Douglas Mechanical LLC (HVAC and plumbing); Dean Flooring LLC (flooring); and Bull Electrical LLC (electric).[1]  (ECF No. 21-2 at PageID.928-29 ¶ 14.)  The various Stark entities operate from the same building in Livonia, Michigan.  (*See id.* at PageID.942 ¶ 78.)

In 2017, Carpenter asked Butcher to invest in him and start an exterior and window company together.  (*Id*. at PageID.930 ¶ 21.)  Rocket Exteriors was incorporated on August 12, 2020 (ECF No. 11-14), and started as a construction company providing a range of exterior improvement services (e.g., facades, siding, roofing, gutters, doors, and windows) for residential homes and multi-family buildings throughout southeastern Michigan (ECF No. 21-2 at PageID.931 ¶ 23).

---

[1] Butcher transferred his interests in Stark to Asgard in 2023.  (ECF No. 21-2 at PageID.929 ¶ 16.)  Beginning in 2023, Asgard owned Butcher's interests and acted as an overhead consolidation and management company that provided back-office processes to Butcher's family of companies, which at the time were: MDOC, Ultra, Max Electric, M1 Construction Company (general contracting), Dean Flooring, and Rocket Exteriors.  (*Id*. at PageID.929-30 ¶ 17.)  Butcher transferred his interest in Asgard to his company Blaze Holdco in 2025, which owns Asgard and, as of 2026, Ultra Plumbing.  (*Id.* at PageID.930 ¶¶ 19-20.)

Pursuant to an August 21, 2020 Operating Agreement, Stark was Rocket Exteriors' only member and Butcher was its sole manager.  (ECF No. 21-3.)  Butcher purchased Rocket Exteriors' domain name, "rocketexteriors.com," in August 2020. (ECF No. 21-2 at PageID.935 ¶ 42; ECF No. 21-12.)  Butcher conveyed his interest in Stark to Asgard in 2023.  (ECF No. 21-2 at PageID.929 ¶ 16.)

Rocket Exteriors used these logos (hereafter "Marks") since its inception:

   

(ECF No. 11-3 at PageID.303 ¶ 21, PageID.307 ¶ 33.)  From 2020 to the present, Rocket Exteriors has continuously used the Marks in U.S. commerce in a variety of ways, including in recruiting, advertising, marketing, branding, selling its services, on employee uniforms, apparel, and on company vehicles.  (ECF No. 11-16; ECF No. 11-3 at PageID.304-07 ¶¶ 24-35.)  The Marks also have been included on materials advertising the "Stark Family of Companies" (*see* ECF No. 21-2 at PageID.935-36 ¶ 45), as shown here:

6



(*See id.*; *see also* ECF No. 21-17 at PageID.1101.)

On May 19, 2022, Butcher filed Articles of Organization for Rocket Interior

LLC.  (ECF No. 21-14.)  Well before that date, in September 2020, Butcher

considered several logos for "Rocket Interiors," one of which was



(ECF No. 21-13.)  The same style "R" also appeared on a July 12, 2024 Request for Qualification which Carpenter prepared for "Rocket Construction Group." (ECF No. 21-15 at PageID.1075.)

Initially, Rocket Exteriors subcontracted exterior work (windows and doors) to Carpenter's company, Kali Construction Inc.  (ECF No. 21-2 at PageID.931 ¶¶ 24-25.)  According to Butcher, in late 2022,[2] Carpenter became an employee of, and received work for Rocket Exteriors, through Beast Craftsmen, LLC, which Butcher formed as a Professional Employer Organization to serve as the employer of record for the employees of Butcher's various companies.  (ECF No. 21-2 at PageID.930-31 ¶¶ 18, 26.)  Carpenter was responsible for sales, project estimating, project management, scheduling, safety and quality oversight, and managing project managers and field personnel.  (*Id*. at PageID.931 ¶ 27.)

On January 17, 2023, Butcher and Carpenter executed a "Partner Agreement of Rocket Exteriors LLC" ("2023 Partner Agreement") whereby Carpenter and Butcher, as Managing Member of Asgard, were granted equal shares of Rocket Exteriors.[3]  (ECF No. 21-6.)  According to the 2023 Partner Agreement, Butcher

---

[2] Butcher states that he only started Beast Craftsmen in 2023, which conflicts with his claim that Carpenter became an employee in 2022.

[3] Plaintiffs attached a copy of the agreement to their Complaint and motion reflecting an effective date of January 1, 2020.  (*See* ECF No. 1-3; ECF No. 11-2.) They refer to this as the "original 2020 Partner Agreement."  (*See, e.g.*, ECF No. 1 at PageID.12 ¶¶ 59-60.)  However, in the "Index of Exhibits" attached to both

and Carpenter served as Rocket Exteriors' initial managers.  (*Id.* at PageID.978

§ 4.1.1.)  The 2023 Partner Agreement provides that Rocket Exteriors would enter

into a management agreement with Asgard, which Butcher managed.[4]  (*Id.* at

PageID.979 § 4.5.)

_____

filings, Plaintiffs identify this document as the "2023 Partner Agreement."  (*See* ECF No. 1-1; ECF No. 11-1.)  Plaintiffs allege in the Complaint that another Partner Agreement was signed in 2023, and they refer to this later agreement as the "operative" agreement.  (*Id.* at PageID.14 ¶ 69.)

  Defendants attach the 2023 agreement to their response brief (ECF No. 21-6), although Defendants say the agreement was made retroactive to 2022, so Carpenter received a Schedule K-1 for his part of the company's tax return (ECF No. 21-2 at PageID.932 ¶ 30.)  Aside from the date in the recital, both agreements appear to be identical.

  There are aspects of the agreements provided by the parties that undermine Plaintiffs' assertion that there was a partner agreement effective in 2020.  First, both the purported 2020 agreement and the 2023 Partner Agreement contain this footer on each page:

*J Carpenter – Jan 2023*
*Partner Agreement*
*Rocket Exteriors LLC*

(*See* ECF No. 1-3; ECF No. 21-6.)  Second, the parties initialed each page of both agreements and the initials look identical on every page, except for the initials on the first page of the earlier agreement—the only page bearing the 2020 date.  (*Id.*; *see also* ECF No. 1-3 at PageID.83; ECF No. 13-6 at PageID.478.)  In any event, for purposes of Plaintiffs' pending motion, the Court finds it unnecessary to resolve whether a partner agreement was signed by Butcher and Carpenter in January 2020, particularly given that the parties agree that the 2023 Partner Agreement is the operative contract.

[4] In fact, Asgard and Carpenter, on behalf of Rocket Exteriors, executed a Management and Operations Agreement, effective January 17, 2023.  (ECF No. 21-8.)  Pursuant to the agreement, Asgard provided management and operational support to Rocket Exteriors, including administering and supervising finances

9

The 2023 Partner Agreement includes a covenant whereby Butcher, as Managing Member of Asgard, and Carpenter agreed that if their membership in Rocket Exteriors was sold, the selling partner could not *inter alia* "compete with the Company with respect to any of the business activities conducted or engaged in by the Company[]" for a 12-month period and in a radius of 60 miles of any business location of Rocket Exteriors.  (ECF No. 21-6 at PageID.992 §§ 11.1.6, 11.1.7, 11.2.2.)  There is a tolling provision in the 2023 Partner Agreement that extends this period in the event of a breach of violation of the agreement or the restrictive covenants.  (*See id.* at PageID.993 § 11.5.)  Butcher, as Managing Member of Asgard, and Carpenter also agreed to the following provision regarding Confidential Information:

> The Members, Michael Butcher, Managing Member of Asgard Investments, and Jesse Carpenter, do each covenant and agree that, before, on or after the date of execution of this Agreement, it/he shall not, directly or indirectly, disclose or make available to any person, firm, Company, association, partnership, limited liability company, or other entity for any reason or purpose whatsoever, or use or cause to be used in any manner adverse to the interests of the Company or its Affiliate any Confidential Information.  The Members, Michael Butcher, Managing Member of Asgard Investments, and Jesse Carpenter, further agrees [sic] that all Confidential Information in his possession that is written or other tangible form [sic] (together with all copies or duplicates thereof) shall at the time of the termination of his employment be delivered to the Company and shall not be retained by

---

(e.g., taxes, accounting, record keeping, and managing accounts payable).  (*Id*. at PageID.1034 §§ 1, 2.1.)

him, or furnished to any third party, either by copy, sample, electronic mail, facsimile or verbal communication.

(*Id*. at PageID.992-93 § 11.3.)  "Confidential Information" is defined to include Rocket Exteriors' contact lists, customer lists, trade secrets, information regarding trademarks or other intellectual rights, and company records.  (*See id*. at PageID.991 § 11.1.2.)  The parties agreed that any breach of the agreement "will cause substantial and irreparable harm to the Company for which money damages would be an inadequate remedy."  (*Id*. at PageID.993 § 11.4.3.)

From January 2020 through April 2025, when Rocket Exteriors performed general contracting services, it was done through Butcher's residential builder's license.  (ECF No. 21-2 at PageID.933 ¶ 36.)  Rocket Exterior did not hold trade licenses to perform mechanical, plumbing, or electrical work, and so it subcontracted trade work to licensed companies, including Ultra Plumbing, Max Electric, and MODOC.  (*Id*. ¶ 38.)

Butcher claims that, in late 2024, Carpenter approached him about purchasing Asgard's 50% interest in Rocket Exteriors.  On April 2, 2025, Butcher, as Managing Member of Asgard, and Carpenter executed a "Letter of Intent" ("LOI").  (ECF No. 1-2.)  The LOI provides:

> RECITALS WHERE AS [sic] Asgard Management is the currently [sic] 50% owner of Rocket Exteriors ("the Company"); WHEREAS, Jesse Carpenter desires to purchase Rocket Exteriors from Asgard Management; WHEREAS, the Parties have agreed to the terms of the sale as outlined below."

11

(*Id.*)  Those terms include the purchase price of $227,000.00, with $40,000 paid on the date of the agreement to Asgard from Rocket Exteriors' account, $23,000 paid within 14 days, and $200,000 seller financing at 12% interest over a 60-month term, starting January 1, 2026.[5]  (*Id.*)  Although the LOI appears to contain the essential terms of the sale, Butcher claims the parties intended to negotiate a detailed purchase agreement with a complete set of terms.  (ECF No. 21-2 at PageID.939 ¶ 59.)

The parties thereafter exchanged documents electronically (i.e., via email and through DocuSign).  (*See id.* at PageID.939-40 ¶¶ 60-62; ECF No. 21-22; ECF No. 21-23.)  A letter from Carpenter's current counsel to Defendants' former counsel reflects that, on November 18, 2025, Carpenter signed several documents which he received from Defendants' former counsel via DocuSign, although Defendants did not counter-sign them.  (ECF No. 21-24 at PageID.1179.)  According to Carpenter's counsel, after Carpenter contacted Asgard to inquire as to the status of the signatures, Butcher demanded $20,000 more from Carpenter to close the deal.  (*Id.* at PageID.1180.)  When Asgard and Butcher failed to sign the

---

[5] The math in the LOI does not add up, as after the initial payments of $40,000 and $23,000, the amount left to be financed should be $164,000.  At the motion hearing, when asked to explain the discrepancy, Plaintiffs' counsel explained that he believed the parties attempted to incorporate interest in the amount financed.

documents by December 17, 2025, Carpenter's counsel "revoked" Carpenter's signatures.  (*Id.*)

Defendants therefore take the position that no agreement was reached to sell Asgard's interest in Rocket Exteriors to Carpenter, and that Asgard, therefore, still owns a 50% interest in Rocket Exteriors.  (ECF No. 21-2 at PageID.940 ¶ 65.) Defendants maintain that the LOI, as its title suggests, reflects only an intent to enter a contract in the future.  However, in a text message on May 17, 2025, Butcher told Carpenter:  "As far as im [sic] concerned it's your company and you have payments that start January."  (ECF No. 15-2.)

Moreover, as Plaintiffs' counsel pointed out at the motion hearing, none of the payments that Plaintiffs have made in accordance with the LOI have been rejected or returned.[6]  Butcher, as Argard's representative, also transferred Rocket Exteriors' bank accounts to Carpenter.  He also walked away from the company in April 2025, and has not been involved since.

On October 1, 2025, Butcher changed the name of his HVAC company, MODOC, to "Rocket Service Pros" ("Rocket Service").  (ECF No. 1-6.)  Butcher also created this logo for Rocket Service:

---

[6] This amount includes the initial $40,000 and $23,000 payments, as well as the monthly installments paid on the promissory note.



(*See, e.g.*, ECF No. 11-5 at Page ID.314.)  In late 2025, Butcher consolidated the service divisions of several companies he controls into Rocket Service, so that Rocket Service now offers HVAC, plumbing, electrical, drain clearing services, and refrigeration repairs and replacement.  (ECF No. 21-2 at PageID.941 ¶¶ 71-72; *see also* ECF No. ECF No. 21-3 at PageID.308 ¶ 39.)  Rocket Service does not perform any exterior work.  (ECF No. 21-2 at PageID.942 ¶ 75.)

Butcher contends that Rocket Exteriors did not directly perform mechanical, plumbing, or electrical services from 2020 through April 2025.  (*Id.* ¶ 74.)  While Plaintiffs show that Rocket Exteriors quoted and performed these services for customers, (*see* ECF Nos. 11-11 to 11-13; ECF No. 11-3 at PageID.301 ¶¶ 4-8; ECF No. 11-4 ¶¶ 4-8), they do not rebut Defendants' evidence that such work was performed through subcontractors (ECF No. 21-1 at PageID.934 ¶ 38).

## III.   Applicable Law and Analysis

### A.   Likelihood of Success on the Merits

In support of their preliminary injunction motion, Plaintiffs contend that they are likely to succeed on their breach of contract, common law trademark, and federal and common law unfair competition claims.

### 1.      Breach of Contract (Count I)

To prevail on their breach of contract claim, Plaintiffs must demonstrate a contract, breached in some way by Butcher and Asgard, resulting in damages to Plaintiffs.  *Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014).  Plaintiffs claim Butcher and Asgard breached the non-compete clause of the 2023 Partner Agreement by providing HVAC, electrical, and plumbing services through Rocket Service.  As set forth earlier, in this clause, Butcher and Asgard agreed not to compete with Rocket Exteriors, directly or indirectly, "with respect to any of the business activities conducted or engaged in by [Rocket Exteriors]."  (ECF No. 21-6 at PageID.992 § 11.2.4.)  The noncompete clause was enforceable within a 60-mile radius of any business location of Rocket Exteriors and "during the term a Member owns any Membership Interest in [Rocket Exteriors] and for a twelve month period following the sale of such Member's Membership in the Company."  (*Id* §§ 11.1.6, 11.1.7.)

The "rule of reason" applies when evaluating a noncompete agreement between businesses.  *Innovation Ventures v. Liquid Mfg.*, 885 N.W.2d 861, 873-74 (Mich. 2016).  The reasonableness of a noncompete agreement "is 'inherently fact-specific'" but "is a question of law where relevant facts are undisputed."  *Bar's Prods., Inc. v. Bars Prods. Int'l Inc.*, 662 F. App'x 400, 409-10 (6th Cir. 2016).  The party disputing the applicability of the noncompete agreement bears the

15

burden of showing that it is unreasonable. *Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 912 F.3d 316, 341 (6th Cir. 2018).

Before considering whether the non-compete clause in the 2023 Partner Agreement is reasonable, the Court addresses whether it is even being breached based on the facts Plaintiffs allege here. To do so, the Court starts by interpreting the covenant. The contract is governed by Michigan law. (*See* ECF No. 21-6 at PageID.990 § 10.3.)

Under Michigan law, "[a]bsent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Innovation Ventures v. Liquid Mfg.*, 885 N.W.2d 861, 870 (Mich. 2016) (quoting *Universal Underwriters Ins. Co. v. Kneeland*, 628 N.W.2d 491, 494 (Mich. 2001)). "When interpreting a contract, [the court's] primary obligation 'is to give effect to the parties' intention at the time they entered into the contract.'" *Id*. (quoting *Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 102 (Mich. 2014)). To do so, courts examine "the language of the contract according to its plain and ordinary meaning." *Id*.

"If the contractual language is unambiguous, courts must interpret and enforce the contract as written." *Id*. "Michigan courts consider a contract ambiguous when 'two provisions of the same contract irreconcilably conflict with each other' or when a provision 'is equally susceptible to more than a single

16

meaning.'"  *Marchek v. United Servs. Auto. Assoc.*, 118 F.4th 830, 834 (6th Cir.

2024) (quoting *Kendzierski v. Macomb Cnty.*, 931 N.W.2d 604, 612 (Mich. 2019)).

When presented with an ambiguous contract, extrinsic evidence such as "the

parties' conduct, the statements of its representatives, and past practice[,]" can be

considered to ascertain the parties' intent.  *See Bar's Prods.*, 662 F. App'x at 407

(quoting *Klapp v. United Ins. Grp. Agency*, 663 N.W.2d 447, 454 (Mich. 2003)).

The 2023 Purchase Agreement states, as relevant here:

11.2   Covenant.  The Members, Michael Butcher, Managing Member of Asgard Investments, and Jesse Carpenter, do each covenant and agree that, during the Restraint Period, he will not, directly or indirectly, whether as an employee, officer, director, manager, agent, investor, security holder, creditor, consultant, independent contractor, shareholder, partner, member, joint venturer, co-venturer, or otherwise:

* * *

11.2.4 Within the Restraint Area, compete with the Company with respect to any of the business activities conducted or engaged in by the Company.

(ECF No. 21-6 at PageID.992).  The "business activities" of Rocket Exteriors is

not defined in the agreement, and its meaning cannot be clearly discerned by

referring to a dictionary.  *See Tooling, Mfg. and Techs. Ass'n v. Hartford Fire Ins.*

*Co.*, 693 F.3d 665, 673 (6th Cir. 2002) (citing *Citizens Ins. Co. v. Pro-Seal Serv.*

*Grp., Inc.*, 730 N.W.2d 682, 686 (Mich. 2007)) (indicating that courts may

interpret the terms of a contract not given prior legal meaning by resorting to a lay

17

dictionary).  The term must be interpreted, to the extent possible, so the covenant is not unreasonable and in accordance with the remaining language of the agreement and any extrinsic evidence.

While interpretation of "business activities" will ultimately be for the jury to decide, *see Klapp*, 663 N.W.2d at 453-54, for purposes of Plaintiffs' preliminary injunction motion, the Court finds that, when the parties entered the 2023 Partner Agreement, they intended the term to mean exterior products and services, only. Rocket Exteriors was formed specifically to provide exterior construction products and services.

Moreover, the covenant not to compete was enforceable while Butcher, as representative of Asgard, was a member of Rocket Exteriors.  While a member of Rocket Exteriors, Butcher and Asgard were in the business of providing mechanical, plumbing, electrical, HVAC, and other construction services through Butcher's related entities.  Carpenter knew this.  In fact, Rocket Exteriors subcontracted with Butcher's other entities for those services to complete some of the work Rocket Exteriors was hired to perform.  The record at this stage reflects that it was through those subcontracts that Rocket Exteriors performed mechanical, plumbing, electrical, and HVAC services; Rocket Exteriors did not perform these services directly.  Therefore, Butcher and Carpenter could not have intended the noncompete provision to encompass the business activities of Butcher and

18

Asgard's other entities.  Interpreting the noncompete provision to include the unlimited universe of construction services which Plaintiffs' counsel put forth at the motion hearing would be unreasonable.

As the evidence presented at this time does not show that Defendants are competing with Rocket Exteriors in the exterior products and services business, Plaintiffs are not likely to succeed on their claim that Butcher or Asgard breached the noncompete provision in the 2023 Partner Agreement.

### 2. Unfair Competition under the Lanham Act (Count VI) and Common Law (Count IX) and Common Law Trademark Infringement (Count VIII)

Plaintiffs allege that, by using Rocket Exteriors' name and logo (hereafter "the Marks"), Butcher and Rocket Service are liable for unfair competition in violation of the Lanham Act and common law trademark infringement, and that Butcher, Rocket Service and Asgard are liable for unfair competition in violation of the common law.  "The elements of all these claims are the same, as is the analysis—failure under one is failure under all." *Tenneco Auto. Operating Co. v. Kingdom Auto Parts*, 410 F. App'x 841, 845 (6th Cir. 2010) (citing *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 521 (6th Cir. 2007); *DeGidio v. W. Grp. Corp.*, 355 F.3d 506, 509-10 (6th Cir. 2004); *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 604-05 (6th Cir. 1991)).

"The Lanham Act 'was intended to make actionable the deceptive and misleading use of marks and to protect persons engaged in commerce against unfair competition.'" *Tenneco*, 410 F. App'x 845 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-68 (1992)) (additional quotation marks, ellipsis, and internal citation omitted).  Section 1125(a) of the act provides, in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  Marks need not be registered to be protected.  *Tenneco*, 410 F. App'x at 845 (citing *DeGidio*, 355 F.3d at 509).

When evaluating a claim under the Lanham Act, the Sixth Circuit Court of Appeals uses "the same test to decide whether there has been trademark infringement, unfair competition, or false designation of origin: the likelihood of confusion between the two marks."  *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th

20

Cir. 2006) (citing *Two Pesos*, 505 U.S. at 780).  "The touchstone of liability . . . is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods [or services] offered by the parties."  *Sunless, Inc. v. Palm Beach Tan, Inc.*, 33 F.4th 866, 869 (6th Cir. 2022) (quoting *Daddy's Junky Music Stores, Inc. v. Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997)) (brackets removed).  When deciding whether there is a likelihood of confusion, courts in the Sixth Circuit usually consider the following factors:

> (1) the strength of [the] plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) [the] defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines.[7]

*Id.* (citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)).  The plaintiff need not establish each factor to prevail. *Kibler v. Hall*, 843 F.3d 1068, 1073 (6th Cir. 2016) (citing *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 592 (6th Cir. 2015)).  "Their enumeration is meant 'merely to indicate the need for weighted evaluation of the pertinent facts in arriving at the legal conclusion of confusion.'"  *Id.* (quoting *Frisch's Rests.*, 759 F.2d at 1264).

---

[7] The parties agree that the last factor is inapplicable here.  (ECF No. 11 at PageID.258; ECF No. 13 at PageID.426 n.3.)

As an initial matter, Defendants maintain that Plaintiffs' unfair competition claims fail because Butcher and Stark developed and first used the Marks.  "[T]he senior user of a trademark[,]" Defendants argue, "has superior ownership rights to the mark."  (ECF No. 13 at PageID.418.)  However, Butcher and Stark did not personally use the Marks first.  They did so only as representatives of Rocket Exteriors.  In other words, they used the Marks for Rocket Exteriors alone.

"Precedent . . . suggests that goodwill can implicitly be included in the sale of a business even when not expressly mentioned in the contract."  *Sana Energy Mgmt., Inc. v. United States*, No. 19-11072, 2021 WL 2139095, at \*7 (E.D. Mich. May 26, 2021) (citing *In re Spradlin*, 284 B.R. 830, 836 (E.D. Mich. 2002)).  Trademarks are "integral and inseparable elements of the goodwill of the business or services to which they pertain."  *Visa U.S.A., Inc. v. Birmingham Tr. Nat'l Bank*, 696 F.2d 1371, 1375 (Fed. Cir. 1982)); *see also Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 n. 14 (1982) (trademark represents the owner's "goodwill, which he spent energy, time, and money to obtain"); *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir.1984) (trademarks and trade names embody goodwill of ongoing business).  Once Butcher, as representative of Asgard, sold Rocket Exteriors to Carpenter, Butcher and Asgard may no longer refer to the history or Rocket Exteriors in their attempt to market competing products.  *Francis S. Denney, Inc. v. I.S Labs., Inc.*, 758 F. Supp. 140, 145 (S.D.N.Y. 1990) (citing *Levitt Corp. v.*

22

*Levitt*, 593 F.2d 463 (2d Cir. 1979); *see also Heaven Hill Distilleries, Inc. v. Log Still Distilling, LLC*, 575 F. Supp. 3d 785, 807-08 (W.D. Ky. 2021) (citing *von Rosenberg v. Lawrence*, 429 F. Supp. 3d 175, 184-85 (D.S.C. 2019)).  The marks were not being used in commerce in connection with any other entity, much less Rocket Service, which did not exist.

Defendants attach evidence reflecting Butcher's use of the unique "R" in connection with "Rocket Interiors."  (ECF No. 21-13 at PageID.1064.)  However, Defendants offer no evidence suggesting that the name or the entity's logo have been used or, more importantly, used in commerce.[8]  *See Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1108 (6th Cir. 1991) (focusing on whether the mark is "actively used in commerce" not merely the existence of third-party marks).  Defendants also attach a July 12, 2024 Request for Qualification ("RFQ") (ECF No. 21-15 at PageID.1075), but Carpenter appears to have prepared the RFQ on behalf of "Rocket Constructions Group" (*see id*. at PageID.583).  Rocket Construction is not identified in the list of entities owned by Butcher, Stark, and/or Asgard.  In fact, according to the State of Michigan Department of Licensing and Regulatory Affairs, Rocket Construction Group was organized by Carpenter in June 2024.  *See* *https://mibusinessregistry.lara*.

---

[8] Notably, Butcher does not list this entity among the Stark or Asgard family of companies.

In short, Rocket Exteriors—whether owned by Asgard, Asgard and Carpenter, or only Carpenter—is the senior user of the Marks.

### a.        Likelihood of confusion factors

### i.        Strength of the Marks

This factor "focuses on the distinctiveness of a mark and its recognition among the public." *Progressive Distrib. Servs., Inc. v. UPS, Inc.*, 856 F.3d 416, 427 (6th Cir. 2017) (quoting *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 631 (6th Cir. 2012)); *see also id.* (citing *Homeowners Grp. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991)) ("A mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source"). "The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due." *Id.* at 427 (quoting *Daddy's Junky Music*, 109 F.3d at 280). There are two components to the strength of a mark: "(1) 'conceptual strength,' or 'placement of the mark on the spectrum of marks,' which encapsulates the question of inherent distinctiveness; and (2) 'commercial strength' or 'the marketplace recognition value of the mark.'" *Progressive Distrib. Servs.*, 856 F.3d at 427 (quoting *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012)).

With regard to the spectrum of marks, there are four categories: "generic, descriptive, suggestive, and fanciful or arbitrary." *Id.* at 428 (quoting *Therma-*

*Scan*, 295 F.3d at 631).  Generic marks lie at the end of the spectrum and generally

are not protected.  *See Champions Golf Club, Inc. v. The Champions Golf Club*, 78

F.3d 111, 1117 (6th Cir. 1996).  They consist of words that identify a commonly

recognized class of goods or services: "aspirin," "escalator," and "light beer."  *Id.*;

*see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 193-94

(1985) (citation omitted).

A descriptive mark "describes a characteristic or ingredient of an article."

*Champions Golf Club*, 78 F.3d at 1117 (quoting *Induct-O-Matic v. Inductotherm

Corp.*, 747 .2d 358, 362 (6th Cir. 1984)).  Examples include "BEST, SUPERIOR,

and PREFERRED."  *Id.* (citation omitted).  "A descriptive mark is entitled to

protection only upon a showing of secondary meaning, that is by becoming

distinctive of the applicant's goods."  *Id.* (cleaned up).  A descriptive mark

acquires a secondary meaning when the buying public recognizes the source of the

good or service as a result of the mark.  *Id.* at 1117.  "In other words, the article

must proclaim its identification with its source, and not simply stimulate inquiry

about it."  *Id.* (quoting *S.P.A. Escercizio v. Roberts*, 944 F.2d 1235, 1239 (6th Cir.

1991)).  Examples include "Kentucky Fried Chicken" and "American Airlines."

*See OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 340 (4th Cir. 2009).

Suggestive marks suggest "an ingredient or characteristic of the goods and

requires the observer or listener to use imagination or perception to determine the

25

nature of the goods." *Champions Golf Club*, 75 F.3d at 1117 (quoting *Induct-O-Matic*, 747 F.2d at 362). "Citibank," which indicates a bank located in an urban area, is an example. *Id.*

"Fanciful and arbitrary marks are the strongest." *Id.* (citing *Little Caesar Enters. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987)). "'An 'arbitrary' mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached,' such as CAMEL cigarettes or APPLE computers." *Id.* quoting *Little Caesar*, 834 F.2d at 571.

Plaintiffs maintain that the Marks are arbitrary because they have "significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached (e.g., Camel cigarettes or Apple computers)." (ECF No. 11 at PageID.254-55 (quoting *Little Caesar*, 834 F.2d at 571.) Plaintiffs explain that people know what "rockets" and "exteriors" are but do not normally use "rockets" to signify "exteriors." (*Id.* at PageID.255.) Combined with the name is the distinct "R" logo. Defendants do not dispute Plaintiffs' argument.

Defendants maintain, however, that Plaintiffs fail to do the necessary commercial strength analysis to show the Mark is "strong." (ECF No. 13 at PageID.422 (citing *Kibler v. Hall*, 843 F.3d 1068, 1073 (6th Cir. 2016).) Because

26

"rocket" is commonly used by over one hundred Michigan companies across several industries, including some in the construction industry (*see* ECF No. 21-27), Defendants maintain the Marks are weak (ECF No. 13 at PageID.422).  While Plaintiffs show that they have used the Marks in various channels of commerce (ECF No. 11-3 at PageID.307 ¶ 30), Defendants contend that Plaintiffs have not tied those marketing efforts to "broad public recognition" or show marketing expenditures (ECF No. 13 at PageID.422 (citing *Progressive Distrib.*, 856 F.3d at 430)).

The Court finds the Marks to be arbitrary and distinctive and conceptually strong.  Plaintiffs invested substantial time, effort, and money in advertising and promoting their services using the Marks.  (ECF No. 11-3 at PageID.307 ¶ 32.) Those efforts likely have resulted in consumer awareness of the Marks.  *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 640 n.14 (6th Cir. 2002) (including the amount and manner of advertising as element in evaluating consumer awareness of the plaintiff's mark); *Scotts Company LLC v. Proctor & Gamble Co.*, 789 F. Supp. 3d 539, 571 (S.D. Ohio 2025) (finding likelihood that the plaintiff's mark acquired distinctiveness in part due to the money spent on advertising, which included the mark, and company recognition in the market).

Thus, the Court finds that the Marks are commercially strong.  This first factor weighs in favor of Plaintiffs.

### ii.      Relatedness of the Services

"This factor admits of three possible scenarios[,]" as the Sixth Circuit has described:

> (1) cases in which the services of the parties are in direct competition, "in which case confusion is likely if the marks are sufficiently similar"; (2) cases in which the "services are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors"; and (3) cases in which the "services are totally unrelated, in which case confusion is unlikely."

*Champions Golf Club*, 78 F.3d at 1118 (quoting *Homeowners Grp.*, 931 F.2d at 1108).  "Services and goods are 'related' not because they coexist in the same industry," but because they "are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company."  *AWGI, LLC v. Atlas Trucking Co.*, 998 F.3d 258, 266 (6th Cir. 2021) (quoting *Leelanau Wine Cellars*, 502 F.3d at 516).  Applying this definition, the Court finds the services of Rocket Exteriors and Rocket Service to be related.

This factor therefore weighs in favor of finding a likelihood of confusion.

### iii.     Similarity of the marks

"Courts give similarity considerable weight and consider the 'pronunciation, appearance, and verbal translation of conflicting marks.'"  *AWGI*, 998 F.3d at 266

28

(quoting *Leelanau Distrib. Servs.*, 502 F.3d at 516-17).  "The court must 'view marks in their entirety and focus on their overall impressions, not individual features.'"  *Id.* (quoting *Leelanau Distrib. Servs.*, 502 F.3d at 517); *see also Kibler*, 843 F.3d at 1077 (instructing courts "not to dwell on the prominent features of a mark and instead consider it as a whole").  Nevertheless, the court may assign more weight to the dominant features of the marks.  *Id.* (citing *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 592 (6th Cir. 2015)).

 

The unique "R" used by Rocket Service is identical—albeit in a different color combination—to the "R" in Rocket Exteriors' logo.  The color distinctions do not detract from their otherwise identical styling.  The "R" is a dominant feature of both logos.  Further, in both entities' logos, "Rocket" with the distinctive "R" predominates.

For these reasons, this factor also supports a likelihood of confusion.

### iv.    Evidence of actual confusion

"Nothing shows the likelihood of confusion more than the fact of actual confusion."  *AWGI*, 998 F.3d at 267 (quoting *Progressive Distrib. Servs.*, 856 F.3d at 433). Yet, while "[e]vidence of actual confusion is undoubtedly the best

evidence of likelihood of confusion . . . it does not follow that lack of evidence of actual confusion should be a significant factor[.]" *Wynn Oil*, 839 F.2d at 1188. "Due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant." *Bliss Collection, LLC v. Latham Companies*, 82 F.4th 499, 512 (6th Cir. 2023) (quoting *Daddy's Junky Music*, 109 F.3d at 284) (alterations omitted).

"Isolated instances of confusion are insufficient to support a finding of likely confusion." *Id.* (quoting *Progressive Distrib. Servs.*, 856 F.3d at 433) (brackets omitted) (alteration removed). Nevertheless, "[a] single instance of actual confusion can, in some cases, 'increase the likelihood of confusion.'" *Id.* (quoting *Innovation Ventures*, 763 F.3d at 536). For example, "[w]hen evidence of confusion would be unexpected due to a small market or a recent act of infringement, a single instance of confusion can serve as strong evidence of potential future confusion." *Colors+ v. Color+ Counseling, LLC*, 782 F. Supp. 3d 579, 624 (N.D. Ohio 2025) (citing *Little Caesar*, 834 F.2d at 571-72); *Maker's Mark*, 679 F.3d at 422).

MODOC changed its name to Rocket Service within the last six months. The Rocket Service name and logo were first used publicly only more recently. On March 25, Carpenter received a text message from an acquaintance, with a picture of a Rocket Service flyer, and the message: "Your flyers look great. I

30

don't need any plumbing work done anytime soon.  I have a new system, but I'm sure I'll have some projects pop up this summer.  I'll let you know."  (ECF No. 20 at PageID.910.)  Given the recent infringement, the Court finds even this one example of actual confusion informative of a likelihood of confusion.

### v.    Marketing channels used

"This factor considers 'how and to whom the respective goods or services of the parties are sold.'"  *Bliss Collection*, 82 F.4th at 512 (quoting *Champions Golf Club*, 78 F.3d at 1120).  Rocket Exteriors and Rocket Service sell their services to similar customers in similar ways.  Their services may not be identical, but they are similar.

Thus, this factor also weighs in favor of Plaintiffs.

### vi.    Likely degree of purchaser care

This factors looks at the care a "typical buyer exercising ordinary caution" exhibits when selecting the particular good or service.  *Bliss Collection*, 82 F.4th at 513 (quoting *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 797 (6th Cir. 2015)).  "[C]onfusion is less likely in cases involving expensive or unusual services or unusually skilled buyers."  *Id*. (quoting *Grubbs*, 807 F.3d at 797).  "For example, 'home buyers will display a high degree of care when selecting their real estate brokers, whereas consumers of fast-food are unlikely to employ much care during their purchases."  *Id*. (quoting *Daddy's Junky Music*, 109 F.3d at 285).

"The effect of purchaser care, although relevant, will be less significant than, or largely dependent upon, the similarity of the marks at issue." *Bliss Collection*, 82 F.4th at 513 (quoting *Daddy's Junky Music*, 109 F.3d at 286). "For example, if the marks in question are found to be similar, 'then purchaser case will decrease the likelihood of confusion only minimally' because the care and skill the consumer would have used to purchase the product will not have necessarily extended to the consumer's decision regarding which retailer to buy from." *Id.* (quoting *Daddy's Junky Music*, 109 F.3d at 286).

Plaintiffs maintain that the similarity of Rocket Exteriors' and Rocket Interior's marks, as well as the fact that Rocket Service operates out of Rocket Exteriors' former location, undermines the significance of this factor. (ECF No. 11 at PageID.257.) Defendants assert that "the ordinary customer needing new windows is not going to call a plumbing company for a quote." (ECF No. 13 at PageID.424.) They also contend that no consumer ever walks into Rocket Service's building inquiring about its services. (*Id.*) However, as to Defendants' first argument, they assume customers (a) recognize that Rocket Service is only a plumbing company or does not sell and install windows and (b) do not mistake Rocket Service for Rocket Exteriors because of their similar logos.

Because the Court finds the marks to be similar, the "likely degree of purchaser care" factor carries little weight.

32

### viii.   Defendants' intent in selecting the mark

The Sixth Circuit has said that "[i]ntent is key." *Bliss Collection*, 82 F.4th at 513.  "If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity."  *Id*. (quoting *Homeowners Grp.*, 931 F.2d at 111).  "Direct evidence of intentional copying is not necessary to prove intent."  *Id*. (quoting *Daddy's Junky Music*, 109 F.3d at 286).  "Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying."  *Id*. (quoting *Daddy's Junky Music*, 109 F.3d at 286).

Plaintiffs maintain that Butcher, Asgard, and Rocket Service's intent "is clear here: to confuse."  (ECF No. 11 at PageID.258.)  Defendants' response goes back to their argument that Butcher, through Asgard, is the senior owner and user of the Marks.  As already discussed, however, Rocket Exterior is the senior user and owner.  Butcher, through Asgard, sold any interest he had in Rocket Exteriors to Carpenter.  Butcher then changed the name and logo of one of his other entities to a name and logo confusingly similar to Rocket Exteriors' name and logo.  The Court agrees with Plaintiffs that an intent to confuse seems clear.

### b.   Conclusion as to confusion

For the reasons discussed, the relevant factors weigh in favor of finding a likelihood of confusion.  Therefore, Plaintiffs demonstrate a likelihood of success

on their federal and common law unfair competition claims and their common law

trademark infringement claim.

## B.    Irreparable Harm to Plaintiffs

An irreparable injury is one "that is not fully compensable by monetary

damages." *Overstreet*, 305 F.3d at 578 (citing *Basicomputer Corp. v. Scott*, 973

F.2d 507, 511 (6th Cir. 1992)).  Under Sixth Circuit precedent, once there is a

finding of trademark infringement or unfair competition, "no particular finding of

likelihood of entry [into the market] or irreparable harm is necessary . . . ." *Circuit*

*City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999) (citing

*Wynn*, 943 F.2d at 608).  This is because "irreparable injury 'ordinarily follows

when a likelihood of confusion or possible risk to reputation appears' from

infringement or unfair competition." *Id.*(quoting *Wynn*, 943 F.2d at 608).

Moreover, effective December 27, 2020, the Lanham Act provides a

"rebuttable presumption of irreparable harm" to a plaintiff seeking injunctive relief

where a likelihood of success on the merits is found.  15 U.S.C. § 1116(a).  Section

1116(a) reads, in relevant part:

> The several courts vested with jurisdiction of civil actions arising
> under this chapter shall have power to grant injunctions, according to
> the principles of equity and upon such terms as the court may deem
> reasonable, to prevent the violation of any right of the registrant of a
> mark registered in the Patent and Trademark Office or to prevent a
> violation under subsection (a), (c), or (d) of section 1125 of this title.
> A plaintiff seeking any such injunction shall be entitled to a rebuttable
> presumption of irreparable harm upon a finding of a violation

> identified in this subsection in the case of a motion for a permanent
> injunction or upon a finding of likelihood of success on the merits for
> a violation identified in this subsection in the case of a motion for a
> preliminary injunction or temporary restraining order.

*Id*. Defendants only argument to rebut the statutory presumption of irreparable harm to Plaintiffs is Defendants' contention that Plaintiffs delayed seeking injunctive relief. The Court finds no delay. MODOC only publicly announced its "rebranding"—i.e., its name change to Rocket Service and new logo—in December 2025. This lawsuit and motion for injunctive relief followed quickly thereafter.

Thus, the Court finds irreparable harm to Plaintiffs absent an injunction.

### C.   Harm to Defendants

Defendants maintain that it would pose an undue hardship to Butcher and Rocket Service to require Rocket Service to change its name and logo, when Butcher and Stark first developed and used the Marks, which was before Carpenter became a member of Rocket Exteriors.[9] As already found, Rocket Exteriors is the senior holder of the Marks. Any harm to Rocket Service is due to Butcher giving a new name and logo to MODOC which copied or mimicked those Marks.

---

[9] Defendants argue that an injunction prohibiting Butcher and his companies from continuing to perform the services they have performed for decades will irreparably harm Butcher, his companies, and the 50 individuals they employ. (ECF No. 13 at PageID.427.) Such injunctive relief would only seem appropriate, however, if Plaintiffs demonstrated a likelihood of success on their breach of contract claim.

**D.     Harm to Others**

There is a public interest in "preventing confusion and deception in the marketplace and protecting the trademark holder's property interest in the mark." *Ignition Athletic Performance Grp., LLC v. Hantz Soccer U.S.A., LLC*, 245 F. App'x 456, 460 (6th Cir. 2007) (quoting *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 383 (6th Cir. 2006)).  Defendants do not contest this, but claim there is no likelihood of confusion.  (ECF No. 13 at PageID.428.)  As discussed, the Court disagrees.  Thus, this factor favors the issuance of an injunction.

**IV.   Conclusion**

Plaintiffs fail to demonstrate a likelihood of success on their claim that Butcher and Asgard breached the noncompete clause in the 2023 Partner Agreement.  Plaintiffs are likely to succeed, however, on their unfair competition and trademark infringement claims.  The remaining factors warrant the issuance of an injunction.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion for a preliminary injunction is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that until further order of the Court, Defendants, their officers, agents, servants, employees, attorneys, successors and

36

assigns, and all persons or entities acting in concert or participation with them, are enjoined from using in any way or otherwise infringing upon the Marks (i.e., "Rocket" and the distinct "R").  Defendants must discontinue their use of the Marks and remove any display of the Marks, including on equipment, advertisements, statements, mailings, online, and apparel.

**IT IS FURTHER ORDERED** that Defendants shall file within fourteen (14) days of this Opinion and Order, a sworn written statement setting forth in detail the manner and form in which Defendants have complied with this Opinion and Order.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: May 12, 2026